**UNITED STATES v. LEVITON et al.**

No. 41, Docket 22076.

United States Court of Appeals Second Circuit.

Argued Oct. 4, 1951.

Decided Nov. 30, 1951.

Frank, Circuit Judge, dissented.

Sidney Feldshuh, of New York City (Feldshuh & Bier, of New York City, on the brief), for appellant Leviton.

Telford Taylor, of New York City (Landis, Taylor & Scoll, Kove & Zeck, William A. Zeck, and George J. Solomon, all of New York City, on the brief); for appellant Blumenfeld.

Murray W. McEniry, of New York City, for appellant Markowitz.

Stanley D. Robinson, Asst. U. S. Atty., of New York City (Irving H. Saypol, U. S. Atty., and Bruno Schachner, Asst. U. S. Atty., both of New York City, on the brief), for the United States, appellee.

Before SWAN, Chief Judge, and CLARK and FRANK, Circuit Judges.

CLARK, Circuit Judge.

These are appeals from convictions under an indictment framed in twenty-one counts. Counts one to eleven charged that defendants "wilfully and knowingly did make and cause to be made false and fraudulent statements in 'Shippers' Export Declarations'" in violation of 18 U.S.C. § 80 (1946 Ed.), now 18 U.S.C. §§ 287, 1001. Counts twelve to twenty-one charged that defendants wilfully and knowingly exported flour and lard in violation of Presidential Proclamation No. 2413, 54 Stat. 2712, promulgated July 2, 1940, pursuant to 50 U.S. C.App. § 701 (1946 Ed.). There was no conspiracy count. After a trial of over a month the jury found Leviton and Blumenfeld guilty on all twenty-one counts, while it acquitted Markowitz on counts twelve to twenty-one and found him guilty on counts one to ten, the eleventh count having been dismissed as to him during the trial. Both Leviton and Blumenfeld received sentences of imprisonment and fines on each of the first eleven counts, Leviton three years to run concurrently and $1,000 fine on each, Blumenfeld a year and a day concurrently, with $500 fine on each. On the other counts they received suspended sentences, with probation of two years and a year and a day respectively after termination of their previous sentences. Markowitz received concurrent sentences of a year and a day on each of the first nine counts, with suspended sentence and probation for two years on the tenth count. On this appeal all the defendants challenge the adequacy of the indictment and the sufficiency of the evidence, and they also assign several errors in the conduct of the trial.

The case as presented by the prosecution—the defendants offering no evidence—was as follows: During the period covered by the indictment—October 11, 1947, to March 12, 1948—private export to Italy of, among other things, wheat and lard was prohibited by the presidential proclamation cited. This restriction, however, did not apply to foreign relief agencies which were authorized to ship wheat (by merely placing the general license symbol "RLS" on their export declarations) and lard (by including a special license number on declarations). At this time Blumenfeld was a merchandise exporter for a private relief agency, Leviton the Traffic Manager for the Barr Shipping Company (the freight forwarding firm handling all New York shipments to Italy for American Relief for Italy, a private relief agency), and Markowitz a visa clerk in the Customs House whose function it was to examine and approve export declarations.

Apparently after a direct, but unsuccessful, attempt through one Saxon to interest Rizzotti, Traffic Manager of American Relief, in his plan to evade the restrictions on private export, Blumenfeld contacted Markowitz and the following scheme was devised. Blumenfeld would make the purchases of the commodities to be exported. Leviton, who administered all regular American Relief shipments generally for Barr, acted as freight forwarder, preparing the necessary documents for transocean shipment, including the shippers' declarations. On these declarations he described the shipments as for the account of American Relief for Italy, care of Societa Soveglianza, Genoa, inserted the name not of the Barr Shipping Company, but of the person from whom Blumenfeld had purchased the commodities as exporter, and inscribed each with the general or special license designations described above. These false declarations were then approved by Markowitz as visa clerk for the Bureau of Customs, since steamship companies would not ship without an export declaration thus cleared. Some ten shipments of varying quantities of wheat or lard were thus effected. On the eleventh attempt, however, another visa clerk in the Customs Bureau received the declaration in question and in this way the scheme was uncovered. Counts one to eleven of the indictment cover the eleven false declara-

tions, counts twelve to twenty-one the ten shipments which were completed.

 Defendants' attack on indictment counts one to eleven is that the false statements and representations made in the export declarations were not made "in a matter within the jurisdiction of the Bureau of Customs, United States Treasury." This contention is based on the ground that the control of exports was lodged with the Department of Commerce by Act of July 2, 1940, as amended, 50 U.S.C.App. § 701 (1946 Ed.), and that the main purpose of these declarations was an informational one for the benefit of the Office of International Trade and the Bureau of the Census. But this assumes too narrow a view of the term "jurisdiction" in 18 U.S.C. § 80 (1946 Ed.). Congress was here concerned with such false statements as might impede the "exercise of federal authority." Terry v. United States, 8 Cir., 131 F.2d 40, 44. The clearance of export shipments was specifically conditioned on presentation of a shipper's declaration to the Collector of Customs. 15 U.S.C.A. § 174, 15 CFR, 1947 Supp. §§ 30.30, 30.31. Hence submission of such declaration to the Bureau, whether or not accepted or acted upon in the prescribed manner, brings it within the jurisdiction of that Bureau. See United States v. Bowman, 260 U.S. 94, 43 S.Ct. 39, 67 L.Ed. 149; United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 85 L.Ed. 598.

Markowitz also raises the question of the validity of the indictment counts one to ten in the light of the proof as to his part in the scheme. As with the other two defendants, his indictment followed the language of the statute in alleging that he made or caused to be made false statements in the export declarations in question. Viewed strictly, the proof established only that he aided in and made possible the use of the declarations, knowing their fraudulent character. Nonetheless, there is no fatal variance between the crimes alleged and the acts proven. The making of false statements in the jurisdiction of a governmental department necessarily includes and requires that such statement be presented with an intention that it be acted upon. United States v. J. Greenbaum & Sons, 2 Cir., 123 F.2d 770. Markowitz' role in the presentation was too crucial for us to say that he played no part in the making of false statements as proscribed by the statute. We have pointed out that indictments under this provision "are to be upheld when they acquaint the defendant with the offense of which he stands charged, so that he can prepare his defense." United States v. Goldsmith, 2 Cir., 108 F.2d 917, 920, 921, certiorari denied Goldsmith v. United States, 309 U.S. 678, 60 S.Ct. 715, 84 L.Ed. 1022; United States v. Achtner, 2 Cir., 144 F.2d 49, 51; United States v. Sherman Auto Corp., 2 Cir., 162 F.2d 564, 565. Especially after jury verdict, as here, the test becomes one of real prejudice. Grey v. United States, 7 Cir., 172 F. 101. There is no intimation that such occurred and we accordingly hold the indictment also valid as to Markowitz.

 We turn next to defendants' contentions as to the insufficiency of proof. The evidence of Leviton's part in the making of the false declarations was so clear that there can be no question as to him; indeed he makes no serious challenge on this issue. Blumenfeld's conviction on counts 12 to 21 alleging conscious violation of the presidential proclamation prohibiting export of certain commodities to specific areas was supported by evidence that he knew of the license requirement and actually made the shipments in question. He was in fact the actual exporter. As to the fraudulent export declarations covered by counts one to eleven, there is admittedly no direct proof that he took any part in the physical preparation of these documents or even that he ever saw them. But he was the one to profit most directly from them, and appropriate circumstantial evidence justified the inference as to his guilt in the absence of any evidence to the contrary. Thus we do have the proof of Blumenfeld's meeting with Rizzotti to arrange for the making of the exports; though this was unsuccessful in its immediate purpose it tended to show Blumenfeld's knowledge as to the need of a relief license to make the shipments. Moreover, in addition to evidence of an attempt on Blumenfeld's part to induce

Saxon to keep silent, there was also evidence connecting Blumenfeld with similar schemes not covered by the indictment. Thus Blumenfeld was shown to be present at another meeting where Leviton agreed to sell a similarly fraudulent export declaration purporting to describe flour shipments to Brazil for $4,000, and therefore well aware of the fraudulent methods employed by Leviton in making the shipments. True, the admission of evidence as to any declarations not covered by the indictments was sharply challenged by the defendants. But the circumstances out of which they grew were too neatly akin to those covered in the indictment to say that such evidence was incompetent on the issues of design and intent here. King v. United States, 8 Cir., 144 F.2d 729, certiorari denied 324 U.S. 854, 65 S.Ct. 711, 89 L.Ed. 1413; Harper v. United States, 8 Cir., 143 F.2d 795; Silkworth v. United States, 2 Cir., 10 F.2d 711, 720, certiorari denied 271 U.S. 664, 46 S.Ct. 475, 70 L.Ed. 1139; 2 Wigmore on Evidence §§ 301, 304, 3d Ed. 1940; 3 Vand.L.Rev. 779, 1950. Thus, ignorance as to details cannot make insufficient unexplained and uncontroverted evidence indicating that Blumenfeld was aware of the necessity for a license and intended Leviton to export the commodities in question for him without a valid one. See Boushea v. United States, 8 Cir., 173 F.2d 131.

The sufficiency of the evidence as to Markowitz, since he was convicted only on the counts covering the ten false documents he initialed by way of approval for the Bureau of Customs, turns upon his knowledge of their falsity. But his signatures on these declarations and upon four Brazilian declarations utilized in the companion schemes were unchallenged. Moreover, it appeared highly improbable, in view of the large number of declarations approved each day by the visa clerks in the Customs House, that Markowitz received these fourteen declarations in the normal course of his duties. This, in the light of the formal irregularities varying in degree but nevertheless apparent on the face of these declarations and a series of observed meetings and conversations with Leviton, was strong circumstantial proof of his guilty knowledge. In the absence of any innocent explanation of these circumstances the jury could properly draw the inference that when Markowitz approved the ten declarations successfully used in the fraudulent scheme he knew their dishonest character.

Coming to the trial, the most important issue there presented, indeed the most substantial one of the appeal, concerns the admissibility of evidence of a confession made by defendant Leviton to agents of the Bureau of Customs after he was taken into custody for questioning, but prior to his arraignment. The evidence consisted of his statements made to the agents and eventually his answers to questions which were taken down stenographically, although not signed by him. The court allowed these to be read in evidence by the stenographer as against Leviton, but excluded them as against the other defendants, and coupled this exclusion with explicit and repeated directions to the jury to disregard the evidence as against the others. Before doing this it conducted a long preliminary hearing out of the presence of the jury, with detailed examination and cross-examination of the four Customs Agents involved, and with an opposing statement from Leviton's counsel as to what Leviton would say if he had taken the stand, somewhat corroborated as to a preliminary stage at Leviton's office by a stenographer there present. This statement, if accepted as proven fact, would have made a showing of coercion probably sufficient to require exclusion. So the court ruled quite properly that this presented a conflict of fact, requiring submission to the jury of the issue under appropriate instructions. Then, after further discussion, he ruled the proffered evidence not rendered inadmissible because of delay in arraignment. Thereafter the agents repeated their testimony before the jury, no evidence to the contrary was offered, and the court submitted the issue of coercion to the jury under an appropriate charge. The verdict therefore settled (as the agents' detailed testimony showed) that there was no coercion in securing the confession. No error is as-

signed on this branch of the issue; on the other branch the question comes down to one of unreasonable delay in making the arraignment under the principle of McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

The testimony of the Customs Agents showed that they were substantially in accord with each other and did not vary in substance on the second telling. From this the following appeared: On March 25, 1948, at about 1:45 p. m., after Leviton had been under surveillance for some days, four Customs Agents entered his office at 505 Fifth Avenue and one of them asked him to come to the Customs Agents' office to talk about some office export files. He said he would be glad to do so, and when the officer asked for his files he agreed to get them and spent some time collecting them. During their stay of about half an hour he asked numerous questions; expressing no surprise, he inquired as to the shipments they were interested in (these agents had no knowledge as to this); and he admitted that he was expecting them. He also asked what he should tell the government officers and was told that he should tell the truth. Then he accompanied the agents in a taxicab to the Office of the Supervising Customs Agent at 201 Varick Street. Arriving there about 2:30 p. m. he entered a conference room to await the questioning officer. During his wait he informed the agent who was with him that "he knew that the Customs Agents were going to come to see him," that he had tried "to make a dishonest dollar," and that he alone of the Barr Shipping Company staff was implicated.

At about 3:30 p. m. the questioning officer came in, apparently to begin the interrogation; it appeared that he had been questioning other persons and business officials in the investigation the customs officers were then making. Leviton answered his initial questions by directing him to the files relevant to the illegal shipments at the Barr Company office, marked "Arthur Blumenfeld." This gave the investigators the important information as to the name of the exporter involved, and the agent left to obtain the files. He returned

with them at about 6:30 in the evening. Leviton then admitted that he had destroyed the file copies of the export declarations themselves. The next step occurred about 9:20 p. m.; the government suggests that the interim was taken up in procuring a stenographer, eating, etc. At that time Leviton was questioned and made answers, stenographically recorded, which laid bare the details of the scheme. The questioning was completed shortly before midnight, at which time he was taken to the Federal House of Detention. Arraignment finally took place at 7 p. m. the next day before Judge Goddard. Since no element of coercion, prolonged questioning, or exploitation of confidence is shown, see Haley v. State of Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224; United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, modifying and affirming Carignan v. United States, 9 Cir., 185 F.2d 954, 957, 958, the sole contention is that the hours intervening between arrest and detailed confession—some seven and a half—tainted the latter so as to make it inadmissible.

The McNabb rule, as explained in Upshaw v. United States, 335 U.S. 410, 413, 69 S.Ct. 170, 172, 93 L.Ed. 100, provides "that a confession is inadmissible if made during illegal detention due to failure promptly to carry a prisoner before a committing magistrate, whether or not the 'confession is the result of torture, physical or psychological.'" We apprehend this to be still the governing principle, notwithstanding some stress on the voluntariness of the confession in the later case of United States v. Carignan, supra. The question is therefore whether or not the detention in this case was illegal up to the moment that the confession began, for subsequent illegality cannot make invalid an already competent confession. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140. As we have had occasion recently to point out, the mere factor of a delay is not of itself decisive on this issue. United States v. Walker, 2 Cir., 176 F.2d 564, 566, 567, certiorari denied 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547. See also Haines v. United States, 9 Cir., 188 F.2d 546, certiorari denied 342 U.S. 888, 72 S.Ct. 172; Pat-

terson v. United States, 5 Cir., 183 F.2d 687; Symons v. United States, 9 Cir., 178 F.2d 615, certiorari denied 339 U.S. 985, 70 S.Ct. 1006, 94 L.Ed. 1388; Garner v. United States, 84 U.S.App.D.C. 361, 174 F.2d 499, certiorari denied 337 U.S. 945, 69 S.Ct. 1502, 93 L.Ed. 1748; Alderman v. United States, D.C.Cir., 83 U.S.App. D.C. 48, 165 F.2d 622; United States v. Keegan, 2 Cir., 141 F.2d 248, reversed on other grounds Keegan v. United States, 325 U.S. 478, 65 S.Ct. 1203, 89 L.Ed. 1745. Rather, Rule 5(a), Fed.Rules Crim.Proc., 18 U.S.C.A., makes the touchstone one of "unnecessary delay."

We have found no definition of "unnecessary" in the cases helpful enough to close the matter for us here. In truth, we think that the traditional use of such words as "undue," "unreasonable," "convenient," "prompt," etc., is striking proof that each case involving the McNabb rule must needs be decided without resort to a semanticism that obscures the facts out of which it arises. Language, in some cases, does seem to warp the rule into a stiff formula that would make no delay "necessary" if the declarant were taken into custody during the regular office hours of an available commissioner who could arraign him. Such a formalization of the rule would, presumably, be easy to apply. But like most "simple" legal rules, the gain in efficiency of decision is more than offset by the lost adaptability to changing circumstances. Furthermore the exception implied in the restriction to "the regular office hours" of an available commissioner shows how unrealistic the principle thus stated is from both the accused's and the court's standpoint. For it operates so uncertainly as not to advance the search for truth at the trial. It means that a week-end or midnight arrest gives the officers all sorts of powers they do not otherwise possess (cf. 2 Okla. L.Rev. 337); they may then delay the arraignment as much as three days if a holiday succeeds the Sunday. See United States v. Walker and the other cases cited supra. Since arraignment before any judge or committing magistrate, state or federal, is permissible, 18 U.S.C. formerly § 591, now § 3041, Rule 5(a), F.R.Cr.P., it is too much to suppose that some such official could not be found in the vast concourse of metropolitan New York at any time of the day or night if actually needed. In this very case arraignment actually took place on Good Friday evening and before a judge, not a commissioner.

■ If, however, we approach the issue from the standpoint of the objective commonly asserted for the McNabb principle, the analysis becomes clear. The rule itself does not assure uncoerced confessions; other rules (such as were here applied) take care of that. Nor is its primary function to confer a procedural advantage on a particular defendant specially situated. Rather it is to compel police observance of the principle to which they have always owed obedience, namely, prompt arraignment of an accused. See United States v. Carignan, supra, 342 U.S. at page 44, 72 S. Ct. at page 102, speaking of "the reason for the rule, i e., to abolish unlawful detention." If that detention exists, the evidence, however valuable, which is its fruit, is unusable; if it does not, then the evidence (if also uncoerced) is available, no matter how bitter the consequences for the accused. On that basis the rule admitting of some delay when a commissioner is not readily available makes sense. It is natural law enforcement procedure to seek a commissioner in his office hours; it would not be natural and hence rational or reasonable to require an officer to seek out perhaps a state judge in the small hours of the morning. This explains, too, the rule that, unlike the showing of noncoercion as to a confession, the burden of showing unreasonableness of delay in arraignment rests upon the defendant, a burden here increased by the definite contrary finding of the trial judge. United States v. Walker and Patterson v. United States, both supra.

So, too, an explanation is afforded for what otherwise might seem at least a surface inconsistency in the cases. In United States v. Mitchell, supra, it was held that arraignment might be delayed to receive a volunteered confession, while in Upshaw v. United States, supra, it was held improper to delay for thirty hours

in an endeavor to secure evidence for a better case. Here, too, the touchstone is decent and responsible police procedure. It is not permissible to use delay for the purposes of inducing confession; but a delay can be shown reasonable when it is induced by the voluntary act of the accused in freeing himself of the burden of guilt. So Haines v. United States, supra, 9 Cir., 188 F.2d at page 553, is directly in point. Haines was arrested between 9 and 10 a. m. and immediately taken to the office of the Secret Service in Los Angeles. There he admitted his guilt and described the counterfeiting activities under investigation. But it was not until evening that he signed the confession—embodying facts related earlier—which was admitted into evidence against him. The court held the written confession competent. The court said that Rule 5(a) was not "deliberately fashioned to fatally taint a voluntary confession for the *sole reason* that it was *received* prior to an arraignment. * * * The plain and simple requirement of Rule 5 is that the arrested person be taken before the magistrate 'without unnecessary delay' and so the question we must face is whether the delay in arraigning appellant until the next day was *reasonably necessary* in order to give the officials here involved an opportunity to check on and verify the available facts he had given them, this in order to determine whether justice and reason called for filing a criminal charge against him." To the same effect is the recent case of United States v. Carignan, supra, 342 U.S. at page 44, 72 S.Ct. at page 101, where the Court, in holding admissible a voluntary confession of a crime other than that charged in the original arraignment, said, "The police could hardly be expected to make a murder charge on

such uncertainties without further inquiry and investigation," and went on to state the reason for the rule, "i. e., to abolish unlawful detention," which we have quoted earlier. See also Garner v. United States and United States v. Mitchell, both supra.

■ The facts in the case before us are directly analogous. Here the delay, though a part of it took place during the daylight hours when committing magistrates were more freely available, was likewise a reasonable one. At the very moment when the officers first approached him, Leviton showed both a sense of guilt and a desire to co-operate which he continued throughout the period until his confession was complete. Quite clearly he was ready to make the full confession later obtained at the very moment of his arrest if the agents had been more sophisticated in their approach and had then pressed for it. But delay ensued naturally and reasonably because of the search which he willingly directed and which was aimed to procure documents as dangerous to him as any full-blown oral statement. Had he been silent and unco-operative, the result might well have been different; but we cannot hold the court in error in concluding that the delay occasioned by his own readiness to confess and voluntary assistance to the investigating authorities was reasonable under Rule 5(a), F.R.Cr.P.[1]

■ This does not fully settle the question raised by several related contentions of defendants Blumenfeld and Markowitz. Defendant Blumenfeld argues that, even if the confession as a whole were admissible, certain portions should have been stricken as irrelevent to the charge against Leviton and prejudicial to him. But we note that no objection, thus call-

---

1. The analysis of the precedents made in the text, while not affording complete comfort to those who believe a certain period for questioning before arraignment—perhaps up to 24 hours, as in England—desirable in the interest of the due administration of justice, does allow moderate time for questioning of a willing accused, whereas a definite and arbitrary time limitation would tend to shut off such unforced, but highly effective, assistance in tracking down crime.

See discussions, e. g., in Comment, 53 Yale L.J. 758, 769; Memorandum on Detention of Arrested Persons, in A Statement by the Committee on the Bill of Rights of the American Bar Association on H.R. 3690, at 48; Waite, Police Regulation by Rules of Evidence, 42 Mich. L.Rev. 679, 689–691; Warner, The Uniform Arrest Act, 28 Va.L.Rev. 315, 339–341, 347; Dession, The New Federal Rules of Criminal Procedure, 55 Yale L. J. 694, 711–713.

ing attention to the portions asserted to be prejudicial, was made during the reading of the stenographic copy. And, although in his brief Blumenfeld's counsel claims to have requested a blanket exclusion of those portions of the confession which were superfluous to the Leviton charge and damaging to himself, we read the colloquy just prior to the admission of the evidence as more an objection that prejudicial "answers would not be *binding* upon him," an objection which was both sustained and re-enforced by the judge when he instructed the jury that the confession should, "as far as is humanly possible, be completely erased from your minds when you consider the case against" Markowitz and Blumenfeld.[2] And the substance of the other objections seems to be only to the general admissibility of the confession which we have already discussed. There was, in addition, no request for severance of the trials made despite the fact that both counsel had read the confession and were subsequently sternly warned that, short of severance, the court's instructions would be the only thing that they could look to, to insulate themselves from the effect of Leviton's statements.[3] Their attack, then, on this instruction as a "ritualistic admonition" can have no force. For the general rule is well settled that, when an instruction to the effect that a confession by one defendant is not to be considered as evidence against another is given in a multi-defendant crim-

inal trial, such confession is properly admitted. United States v. Gottfried, 2 Cir., 165 F.2d 360, certiorari denied Gottfried v. United States, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139. Whatever our personal views as to the efficacy of such an instruction may be, the rule is too well settled to be overturned here, or another, virtually requiring separate trials in all instances, substituted.

Defendants all claim prejudice from three occurrences during the trial before the jury. First among these was a statement by the judge during cross-examination of one Borelli, a government witness and an officer of American Relief for Italy. Counsel for one of the defendants elicited the information that this organization had shipped clothing and a radio to a member of the Italian nobility. The trial judge broke in saying, "What is the purpose of this examination," and continued that he would not permit counsel thus "to bring [American Relief for Italy] under a cloud." He then went on to say that he felt the Voice of America was doing such an important function that perhaps "radios are proper objects to be sent over, so that those people can hear those messages." One of the jurors expressed his agreement with these sentiments by applauding, but was thereupon summarily upbraided by the court for so exposing his emotions. Shortly thereafter the court called the attention of counsel to the juror's act for such ac-

2. If a joint trial is to be had, it is difficult to see how ordinarily protection of other defendants from a confession by one can go much further. Thus an answer now particularly objected to as unnecessarily implicating Blumenfeld does contain an intertwined and highly important admission by Leviton that he "was stupid enough to feel he could make a few easy dollars."

3. The court replied to the objections cited thus: "I will grant your motion to the extent of ruling that the alleged confession is received as against the defendant Leviton alone. And I will instruct the jury that it is to be so received. You are placed upon your own advice as to whether you care to make application for any other relief that might remove your defendant from the semblance of double jeopardy, because I cannot control the thinking or the minds of the jury beyond

carefully instructing them that they are to receive this testimony only as against the defendant Leviton."

To the objection that the admission should not be binding upon Blumenfeld, the judge replied: "That objection is sustained. I thought I covered that when I said I will instruct the jury as to that. Now, to make my position more clear as to counsel for both Blumenfeld and Markowitz, beyond making this ruling in the absence of the jury and instructing the jury with all emphasis at my command that they are to confine their consideration of this confession as against the defendant Leviton in this trial in which there are three defendants, I can do nothing further. That is what I say even to the defendant Blumenfeld: that I place you upon your own advice as to whether you choose to continue in this trial under the circumstances."

tion as they might feel necessary; upon counsel's request, it permitted them to reserve their motions. Some time later when they moved for a mistrial it denied the motion. The actual incident was comparatively short and was satisfactorily terminated by the action of the trial judge in thus completely disavowing the juror's action and in carefully instructing the jury to disregard the colloquy between himself and counsel. While courtroom decorum temporarily suffered, we do not think there was real prejudice to defendants' cases. The questions which brought on the occurrence were only very distantly germane. See McKahan v. Baltimore & O. R. Co., 223 Pa. 1, 72 A. 251. Moreover, the rebuke as such was directed against counsel who stimulated the occurrence, and not against the defendants as individuals. It would probably be desirable that judges not prove even temporarily human during the course of a long and difficult trial; but we do not think reversal should necessarily follow as a matter of law for a slight departure from judicial immobility, promptly corrected and of very doubtful permanent consequence, in an otherwise generally well conducted proceeding.

■ The second occurrence arose during the summation of the United States Attorney, when he informed the jury that the reason for the release from custody of Rizzotti, originally implicated in the scheme by Leviton, was that it had only recently been determined that Leviton would refuse to go before the grand jury to testify against him. Some explanation was called for in the light of a strong attack by defense counsel in summation upon Rizzotti as the real culprit and emphasis upon the government's failure to prosecute him; the only error was in the direct reference to Leviton's refusal, rather than some more generalized reference to a lack of evidence. No objection was made at the time. Under the circumstances of provocation, of lack of objection, and of limited bearing of the incident, we find no reversible error.

■ The third incident involved a newspaper article in the New York Times, December 14, 1949. This account falsely

reported that the indictment covered some $9,500 worth of barbed wire; that Field, a Customs Bureau visa clerk who had received the eleventh and last fraudulent export declaration in this case and who was an important witness for the government, had been offered a $200 bribe by Leviton to suppress this evidence (Leviton had in fact purchased $44 worth of clothing as a gift for Field); and that the defendants were part of a much larger "ring." A copy of the newspaper containing the article was found in the jury room. We do not think, however, that such a report, erroneous as it was, made a fair trial impossible. The judge gave very explicit instructions that the contents of the article were to be disregarded and went on to point out how the offenses set forth in the indictment differed from those described in the article. Trial by newspaper may be unfortunate, but it is not new and, unless the court accepts the standard judicial hypothesis that cautioning instructions are effective, criminal trials in the large metropolitan centers may well prove impossible. United States v. Keegan, supra, 2 Cir., 141 F.2d at page 258. Citations of the reporting media for contempt by publication are rare and the Supreme Court has stated that their activities in reporting criminal trials do not deprive the accused of a fair trial unless there is a "clear and present danger" that such will result. See Ex parte Craig, 2 Cir., 282 F. 138, affirmed 263 U.S. 255, 44 S.Ct. 103, 68 L.Ed. 293; Baltimore Radio Show v. State, Md., 67 A.2d 497, certiorari denied, with opinion by Frankfurter, J., Maryland v. Baltimore Radio Show, 338 U.S. 912, 70 S.Ct. 252, 94 L.Ed. 562; Note, 59 Yale L. J. 534. Such was not the showing here.

Convictions affirmed.

FRANK, Circuit Judge (dissenting).

1. The first ground of my dissent is what I deem a flagrant violation of the so-called "McNabb rule."[1] That rule renders a confession inadmissible in a federal trial if obtained in violation of the requirement, now set forth in Criminal Rule 5(a), that "An officer making an arrest * * *

1. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819; United

States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140; Upshaw v. United

shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States." The purpose of the McNabb rule is to procure for an arrested person the following protections offered by Rule 5(b) governing the arraignment procedure: "The Commissioner shall inform the defendant of the complaint against him, of his right to retain counsel and of his right to have a preliminary examination. He shall also inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules." As the Supreme Court said just the other day, in United States v. Carignan, 72 S.Ct. 97, 102, the McNabb rule rests on the idea that detention without prompt arraignment gives "opportunity for improper pressure * * * before the accused had the benefit of the statement by the commissioner." [2]

Now see how and why Leviton was deprived of that benefit: After several weeks of shadowing, four customs agents entered his office at 1:45 P.M. on Thursday, March 25. The agents announced that he was wanted for questioning at Customs headquarters, and directed him to bring along his export files. The customs agents had no warrant for his arrest. They did not warn him that anything he said would be used against him; they did not advise him of his right to counsel; they made no attempt to arraign him before a magistrate or judge. The agents admitted that, once inside the building, Leviton could not leave:

"Q. Isn't it a fact, Mr. Linden, that Mr. Leviton could not have left the building if he desired? A. I wouldn't have permitted him to leave the building.

"Q. Why? A. Because we wanted to talk to him and find out about the other phases of the case.

"Q. You were the agent in charge of the entire investigation? A. Yes sir.

"Q. So that on the occasion in question, if Mr. Leviton wanted to leave the building you would instruct them not to permit him to leave? A. Not until we were through, that is correct.

"Q. From the moment he was there until you were through with him, with the interrogation, you would not permit Mr. Leviton to leave the building? A. Not by himself."

Since nothing significant occurred between the time the agents entered Leviton's office and the time of his arrival at the building, plainly he would not have been allowed his freedom after 1:45 P. M. In short, he was under arrest from that moment. All afternoon and evening up to the time of his confession, he was kept under guard. The agent in charge of his case testified quite frankly that Leviton's detention was solely for the agents' convenience in interrogating him:

"Q. During the course of the afternoon, you were holding Mr. Leviton in your office until you could assign an agent to question him. Is that the idea? A. That is correct.

"Q. The entire purpose of your detaining Mr. Leviton from the time he entered the building was for the purpose of interrogating him. Is that right? A. Yes, sir."

At one point in the afternoon, around 3:00 or 3:30, Leviton made a remark, according to his guard, that "he thought he could make a fast dishonest dollar but ap-

States, 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100; United States v. Carignan, 72 S.Ct. 97.

2. In the Carignan case, the accused was duly arraigned and imprisoned on a charge of assault. During questioning by the police after arraignment he confessed to an entirely different crime-murder. The Court held that the confession was not inadmissible under the McNabb rule in a subsequent trial for the murder because the accused had received the benefit of the commissioner's statement on his arraignment for assault, and his detention was therefore entirely legal. But see Black, J., Frankfurter, J., and Douglas, J., concurring.

parently he couldn't." Soon another agent came into the room, asked Leviton a general question about flour shipments he had handled, mentioning no particular shipments or countries. Leviton told this agent to look up some files marked "Arthur Blumenfeld" in the Barr Shipping Company. The agent returned with the files at 6:30, and asked Leviton where certain declarations were; Leviton replied that he had destroyed them. Around 9:20, the interrogation began in earnest, and by midnight the defendant had signed a typewritten confession which ended thus: "I have been sitting here for nine hours. I have smoked 100 cigarettes, and I don't know whether I am coming or going." Leviton was taken then to the Federal House of Detention and arraigned the next evening at 7:00 p.m. for the crimes to which he had confessed the previous night.

So Leviton's confession came after 7½ hours in custody. Even his admission (if it can be considered as such) that he had destroyed certain declarations came only after 4½ hours of unauthorized detention. At any time between approximately 1:45 and 5:30 that afternoon, Leviton might have been arraigned before any one of a dozen magistrates or judges in the vicinity. Prompt arraignment meant a great deal to Leviton; no warrant had ever been issued for his arrest; no magistrate had ever declared that there was any "probable cause" for holding him; he was denied altogether the "benefit of the statement by the commissioner" which the Supreme Court considers so important. Because of failure to arraign, he was not informed of the charges against him; he had no counsel; he was not warned, however perfunctorily, that what he said would be used against him—all this for the sole convenience of the customs men in interrogating him—and not, mind you, at once, but when (as one of them testified) they got ready to "assign an agent to question him."

My colleagues say, nevertheless, that the delay in arraigning Leviton was a "necessary one," and that, therefore, the McNabb rule was not violated. They rely on cases holding that delays are "necessary" if caused by unavailability of an arraigning officer when arrests are made at night, on Sunday, or over a holiday, since the rule was not intended to force magistrates to work around the clock. United States v. Walker, 2 Cir., 176 F.2d 564, certiorari denied 338 U.S. 891, 70 S.Ct. 239, 94 L.Ed. 547, was such a case. There the defendant was arrested on Sunday before Labor Day in a small town. We there held that the delay before his arraignment on Tuesday was *prima facie* a reasonable one, and that the defendant had the burden of proving that it was "possible to arraign" him on Sunday or Monday. This, so far as I know, is the longest time any upper court has sanctioned between arrest and arraignment, and I do not hesitate to predict (despite my colleague's insinuation that by the Walker case we have already gelded the McNabb Rule) that this court or any other court would unhesitatingly call unreasonable a week-end delay, upon a showing that the arrest was deliberately made on Saturday or a holiday to prevent prompt arraignment.[3]

3. Time table of length of detentions held reasonable because of unavailability of arraigning officer:

| Case | Time Arrest | Confession |
| --- | --- | --- |
| Walker v. U. S., 2 Cir., 176 F.2d 564, cert. den. 338 U. S. 891, 70 S.Ct. 239. | Sunday, Aug. 31 | Sometime before arraignment on Tuesday, Sept. 2 |
| U. S. v. Keegan, 2 Cir., 141 F.2d 248, rev'd on other grounds Keegan v. U. S., 325 U.S. 478, 65 S.Ct. 1203. | Saturday, July 4 | Monday, July 6 |
| Garner v. U. S., 84 U.S.App. D.C., 361, 174 F.2d 499, cert. den. 337 U.S. 945, 69 S.Ct. 1502. | 9:00 P. M. 10:30 P. M. | 10:30 P. M. 2:30 A. M. |
| Symons v. U. S., 9 Cir., 178 F.2d 615, cert. den. 339 U. S. 985, 70 S.Ct. 1006. | 1:00 A. M. | 8:00 A. M. |

Courts and commentators have conscientiously restricted the meaning of "necessary delay" to a single situation: "Reasonableness (of the delay) will probably depend upon the time required to carry the suspect to the commissioner, and not on the time desired to keep him away from the commissioner. The entire history of committal legislation leads to such an interpretation." [4]

The idea of allowing the police whatever delay before arraignment they may deem "necessary" for interrogation, fights with the basic aim of the McNabb rule: "It aims to avoid all the evil implications of secret interrogation of persons accused of crime." McNabb v. U. S., 318 U.S. 332, 344, 63 S.Ct. 608, 614, 87 L.Ed. 819. In Upshaw v. United States, 335 U.S. 410, 69 S.Ct. 170, 172, 93 L.Ed. 100, where the Supreme Court vitiated a confession on the ground that it had been obtained during a detention which the police admitted was for the sole purpose of investigation, the Court said: "In this case we are left in no doubt as to why this petitioner was not brought promptly before a committing magistrate, * * * because the officer thought there was 'not a sufficient case' for the court to hold him * * *. He admitted that petitioner was illegally detained for at least thirty hours for the very purpose of securing these challenged confessions." The Upshaw situation, in every essential respect, is duplicated here. The Customs men make no pretense that Leviton's 11-hour "visit" was for any other purpose than to facilitate their own investigation. Since Leviton was arrested without a warrant—I note again that no judicial officer had passed on the "probable cause" for his detention—the conclusion seems inescapable that he, like Upshaw, was being held so that the agents could get a good case against him before they had to justify his arrest to a magistrate. But clearly the police, after arrest, cannot make up for their lack of probable cause at the time of arrest. That is what McNabb is for—to make sure that they can't. It should be even more "mechanically" applied in cases of arrests without warrants than in those with warrants.

My colleagues would excuse the failure to arraign here, on still another theory. They rely on cases holding that confessions which are "promptly and spontaneously" made upon arrest are admissible, even when made prior to arraignment. This exception to McNabb is a common-sense concession in the case of a willing defendant who wants to "spill" all as soon as the police finally catch up with him; in such circumstances, the police need not shut his mouth or stuff their own ears with cotton until he can be brought before a magistrate. In such cases, there is no "opportunity for improper pressure by police", to induce the confession. U. S. v. Carignan, 72 S.Ct. 102. United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L.Ed. 1140, is the leading case on this point. There the defendant's confession was given at the police-station

---

4. A Memorandum on the Detention of Arrested Persons in a Statement by the Committee on the Bill of Rights of the A. B. A. on H. R. 3690 (1943) 30. "The new words (in Rule 5a) recognize that delay is inevitably caused by the journey to the commissioner's office and by the fact that the Commissioner does not sleep there." "Our previous discussion has shown the novelty in our law of any plan which bases the length of detention on the need for interrogation or any other purpose except insuring the appearance of the prisoner to answer the duly authenticated charge of a specific crime. * * * Detention overnight till the magistrate reaches his office seems as much as any possibly innocent citizen ought to undergo, without having access to his lawyer and a judicial determination of the propriety of his confinement." "We have found no indication that there was ever any law in the United States or England authorizing a person to be detained for the purpose of facilitating investigation." Ibid. at 29, 31, 12. Dession, New Federal Rules of Criminal Procedure, 55 Yale. L.J. 694, 713 (1946): "But, obviously, the question is whether the duty of arraignment 'without unnecessary delay' permits an arresting officer only such time as may be needed to bring the offender before the nearest available magistrate, or whether, in addition, it permits a certain amount of time for interrogation and investigation. The decisions of the Court, beginning with the McNabb case, clearly suggest the former interpretation."

before commitment, *a few minutes after* two policemen had jailed him on a charge of housebreaking and larceny. His confession was complete and ,detailed; he even directed the policemen to the loot. Appellate courts have followed suit where confessions were dictated and signed within an hour or so after arrival at police headquarters, Patterson v. United States, 5 Cir., 183 F.2d 687; or where an oral confession (complete in all its details) was made immediately after arrest and merely repeated for stenographing later in the day. Haines v. United States, 9 Cir., 188 F.2d 546.

None of these cases touches Leviton's. Although there is talk in the Haines opinion about a reasonable opportunity for the police to check stories of arrested persons before arraigning them, in fact, the defendants in both that case and in *Mitchell* had completely implicated themselves—*i. e.,* beyond extrication—by the time the police began checking their stories. They had made confessions amply sufficient to cinch a verdict of guilt. Leviton, in contrast, dropped one meager remark about "making a dishonest dollar," a remark which, unlike a confession, could not alone possibly secure a conviction. Leviton's is not an instance of a confession begun which would have been interrupted by an arraignment. Indeed, after that remark, Leviton said nothing of significance until three hours later when he admitted destroying certain declarations. My colleagues can point to no cases permitting police to delay arraignment so that they may track down clues and leads which the defendant, consciously or unconsciously, may have revealed, but which, of themselves, do not amount to any sort of confession of a specific crime.[5] If Leviton had been arraigned even by

5:30, the latest moment when, probably, a magistrate could have been conveniently secured, he might have shut up, leaving the puzzled customs men to speculate exactly how he "had made his dishonest dollar," and to search vainly through the files to which he had directed them for vital missing declarations.

My colleagues come up with an astonishing argument, not suggested by the government, that "if the agents had been more sophisticated in their approach, and had pressed for it," Leviton, immediately upon his arrest, would have made a full confession. He showed, my colleagues say, a "sense of guilt" from the beginning, and a desire to "cooperate throughout the period." Accordingly, so my colleagues argue, we must treat the case exactly as if, in actual fact, he had confessed at or almost immediately after the time of his arrest. Therefore, my colleagues conclude, the actual time that elapsed between his arrest and his confession must be disregarded, and the failure during that time to bring him before a commissioner or judge is irrelevant.

To my mind, this argument is itself "sophisticated"—far too much so. It rests on a non-existent fact, a wholly fictitious "fact," *i. e.,* a pretense or make-believe that a confession occurred several hours before it actually occurred. If one could in this way fictionally date a confession back for several hours (by pre-dating or *nunc-pro-tuncing* it) merely because a later actual confession, since it was voluntary, is to be deemed a disclosure of an initial "desire to cooperate," then the McNabb doctrine would be gutted, since never could it be violated. For that doctrine applies only when the government proves, or the defendant admits, that his confession was

5. Time table of admissible spontaneous confessions obtained before arraignment:

| Case | Period between Arrest and Confession | Extent of Confession |
|---|---|---|
| U. S. v. Mitchell, 322 U.S. 65, 64 S.Ct. 896. | Few minutes after arrival at police station | Complete oral confession |
| Haines v. U. S., 9 Cir., 188 F.2d 546. | Immediately on arrival at federal building | Oral confession complete in all details |
| Patterson v. U. S., 5 Cir., 183 F.2d 691. | 30 minutes (government's version)—2 hrs. after arrest (defendant's version) | Signed complete written confession |

voluntary, *i. e.,* "cooperative"; and one could always fictionally assume (as my colleagues assume here) that more adroit officers, immediately upon his arrest, could have converted his "cooperativeness" into a confession. This is a dangerous notion. Is an officer's belief in an accused's "sense of guilt" to create an exception to McNabb? If I am not mistaken, this is a technique frequently used in police states to extort confessions: officials play upon an individual's guilt-proneness by prolonged grilling and humiliating interrogation. It has proved to be an effective device in eliciting confessions—true or false—from certain types of anxious and neurotic persons who will confess their guilt-ridden fantasies under such pressure.[6] (It is worth adding that the trial judge here was not altogether convinced of Leviton's complete "cooperativeness": The judge ruled that an illegal seizure occurred when the customs men took from Leviton a briefcase, although he apparently offered no resistance and reacted with a nod of the head.)

The McNabb rule is especially vital to the protection of just such indiscreet defendants as Leviton, for another basic reason. Despite my colleagues' dismissal of McNabb as merely a sanction or penalty for police misconduct in delaying arraignment, a much more compelling policy lies behind it—*i e.,* the prevention, in the most effective way possible, of coerced confessions elicited by the dreaded "third degree." "For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use." McNabb v. United States, 318 U.S. 332, 344, 63 S.Ct. 608, 614, 87 L.Ed. 819, restated in United States v. Mitchell, 322 U.S. 65, 66–67, 64 S.Ct. 896, 88 L.Ed. 1140;[7] Carignan v. United States, 20 L.W. 4013, 4015. Recognizing the difficulty of proving "torture, physical or psychological" and the "relation between illegal incommunicado detention and 'third-degree' practices", United States v. Mitchell, 322 U.S. 65, 68, 64 S.Ct. 896, 897, 88 L. Ed. 1140, the Court chose to minimize the use of coerced confessions by ruling out automatically any such statements obtained during the period and in circumstances when those police officers who are given to such practices normally apply coercion.[8]

6. Redlich, Ravitz, and Dession, Narcoanalysis and Truth, 107 Am.J. Psychiatry, No. 8, Feb. 1951, conclude on the basis of experiments with drug-induced confessions that certain neurotic individuals with strong feelings of guilt, depression, and anxiety confess most easily, and that such confessions can be as easily obtained without as with the use of drugs. "Open and veiled threats" and "the feeling of inevitable doom" facilitate the development of a reactive depression in any person, but particularly in those with self-punitive tendencies and depressive moods. Such people will confess to false and true fantasies leading to punishment; false and fantastic self-accusations are a part of the depression into which they are thrown by their stimulated fears. The authors explain, on this theory, many of the public trial confessions in totalitarian regimes, and recount examples of false confessions elicited from weak persons near the breaking point without the use of "hard methods" but merely by playing upon their guilt-ridden personalities.

7. "* * * in cases coming from the state courts in matters of this sort, we are concerned solely with determining whether a confession is the result of torture, physical or psychological, and not the offspring of reasoned choice. How difficult and often elusive an inquiry this implies, our decisions make manifest. And for the important relation between * * * incommunicado detention and 'third-degree' practices, see (citations). But under the duty of formulating rules of evidence for federal prosecutions, we are not confined to the constitutional question of ascertaining when a confession comes of a free choice and when it is extorted by force, however subtly applied." United States v. Mitchell, 322 U.S. 65, 68, 64 S.Ct. 896, 897, 88 L.Ed. 1140.

8. Dession, supra, at 710. "The court had apparently come to the conclusion that the only way to eliminate third degree abuses * * * was to insist that there be no incommunicado detention even for a day or two, and even though those detained may be well treated in any case." A. B. A. Committee,

The cases in which defendants confess on arrest are outside the prophylactic policy, on this account: An arrested person who promptly confesses has no need to fear strong-armed police methods. But nothing is more conducive to physical brutality or psychological badgering by so-called "lawless" policeman than a situation in which the defendant, without confessing, mutters something vague about his having been dishonest, or otherwise drops a clue or two. Then undisciplined policemen are most likely to employ "torture, physical or psychological"—to break him down. This kind of susceptible defendant needs McNabb protection the most.

Since Leviton's confession, in my opinion, was inadmissible under McNabb, I think that both his conviction and Blumenfeld's (at least on counts 1–12) should be set aside. There was, my colleagues concede, no "direct proof that he (Blumenfeld) took any part in the physical preparation of these documents or even that he ever saw them." But the prosecution was allowed to read to the jury the following portion of Leviton's confession, implicating Blumenfeld:

"Q. Was Blumenfeld aware of the fact that you were using the license of the American Relief for Italy? A. Yes, sir, because he tried to get them first, and that is how he got to me, because he knew I was the traffic manager for Barr and we handled the American Relief for Italy, and I was stupid enough to feel I could make a few easy dollars, which I see

is not possible." This excerpt from the confession was the only direct testimony that Blumenfeld knew about and sanctioned the illegal scheme. It could easily have turned the trick with the jury. Now, the admissions of one defendant implicating another, are theoretically inadmissible, for obvious reasons, against the person implicated. Such accusations are hearsay— and, in the circumstances, probably ill-motivated and peculiarly untrustworthy hearsay. However, where several defendants are tried jointly, such confessions are received when necessary to prove the declarant's guilt, and a "ritualistic admonition" given to the jury to disregard the contents insofar as they implicate the other defendants. United States v. Lonardo, 2 Cir., 67 F.2d 833; United States v. Gottfried, 2 Cir., 165 F.2d 360, certiorari denied 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139. But I think that such a rule does not excuse what was done here: The statements about Blumenfeld in the confession added nothing at all to the case against Leviton which was not amply proved by the remainder of his confession.[9] The portion relating to Blumenfeld should not have been read to the jury. Blumenfeld's counsel asked for such exclusion before the reading; since he had time only to skim through the document and was not familiar with its contents, he could not point to the specific answers incriminating Blumenfeld. Apparently the judge misunderstood the nature of the objection as to the admissibility of such portions; at any rate he made it clear that he would not exclude the Blumenfeld matter, agreeing

supra, at 15, 17. "Still, it is obvious that the line between proper and improper questioning may easily be passed. Nothing but the conscience of the officers protects a prisoner from milder or drastic forms of the third degree so long as he is in their uncontrolled custody, removed from systematic prison regulations and isolated from the outside world. * * * The danger period, when the third degree is ordinarily administered, begins with arrest and ends when the police bring the prisoner before a magistrate. * * * Coercion itself is always hard to prove because the questioning takes place in secret; but excessive length of confinement is an

objective fact which judges can easily discover and penalize."

9. Compare Leviton's answer to Q. 58 with earlier and later answers.
"Q. 38: Was there anything wrong with these declarations? A. The only thing wrong was that I used somebody else's license with (sic) their permission, and I knew you shouldn't do it."
"Q. 116: Didn't you know that the original declarations then would be on file at the customs house and you might be called upon to explain those declarations being missing? A. I did know that, sir. But I just destroyed them, like sticking your head in the sand. You know you have done something wrong. So I did it."

only to instruct the jury that such portions were not binding against Blumenfeld. Blumenfeld's counsel did not object further to such portions during the reading of the confessions, obviously because he considered his general objection, made before the reading, sufficient. Consequently, I think he cannot be held to have waived his objection.[10] Nor do I think that, previous to the reading of the confession, he had to request a severance or forever after hold his peace. For, at the time when, according to my colleagues, he should have asked for severance, he had not had a fair chance to read through the confession to see whether it was so prejudicial as to require a retrial. He had earlier objected to the introduction of the entire confession as a McNabb violation, and (only because the trial judge ruled erroneously in admitting the confession) he was put in the perplexing position of having to choose, without knowledge of the confession's contents, between continuance and severance.

"It is a hard rule anyway which allows declarations to be used at all in a case where the declarant is tried along with others." L. Hand, J., in United States v. Lonardo, 2 Cir., 67 F.2d 883, 884. It is a harder rule that would allow declarations which cannot be introduced against the declarant to be introduced against his confederates. That is, in effect, what would happen if Leviton's conviction were overturned and Blumenfeld's upheld. Leviton's confession is incompetent under McNabb—

incompetent against not only confederates but against the declarant himself; incompetent in a much more basic way than mere hearsay. The circumstances of a McNabb confession are somewhat akin, in the Supreme Court's thinking, to those of a coerced confession to the extent that they make the evidence generally "bad" or "tainted." I think that, if the trial judge here had ruled correctly, such evidence would never have come in at all. We ought not then to extend the "ritualistic admonition" rule to cover situations where the confession should never have been admitted. To do so would be to penalize a defendant for the trial judge's error as to a codefendant. Thus in Anderson v. United States, 318 U.S. 350, 63 S.Ct. 599, 602, 87 L.Ed. 829, the convictions of all co-defendants tried jointly were reversed where the confessions of some implicating the others had been introduced although obtained in violation of the McNabb rule. Although the "ritualistic admonition" had been given at the time of their introduction, the Court found "There is no reason to believe * * * that confessions which came before the jury as an organic tissue of proof can be severed and given distributive significance by holding that they had a major share in the conviction of some of the petitioners and none at all as to the others. Since it was error to admit the confessions, we see no escape from the conclusion that the convictions of all the petitioners must be set aside." [11]

10. "Mr. Kove (Blumenfeld's counsel): For the record, if your Honor please, I am not accurately familiar with the contents of the alleged questions and answers. I had a very, very brief opportunity to just run through the pages. They are numerous. I don't know at this time to what extent they are prejudicial to the defendant Blumenfeld, but in so far as the record is concerned at this point, I should like to object to the *admission* of any questions and answers involving the defendant Blumenfeld upon the grounds, of course, that any statement in those answers would not be binding upon him.

"The Court: That objection is sustained. I thought I covered that when I said I will instruct the jury as to that. Now, to make my position more

clear as to counsel for both Blumenfeld and Markowitz, beyond making this ruling in the absence of the jury and instructing the jury with all emphasis at my command that they are to confine their consideration of this confession as against the defendant Leviton in this trial in which there are three defendants, I can do nothing further. That is what I say even to the defendant Blumenfeld: that I place you upon your own advice as to whether you choose to continue in this under the circumstances.

"Mr. Kove: On that score, you Honor, I would have to wait and hear what comes in. I don't know."

(Emphasis added.)

11. In the Anderson case, to be sure, the trial judge omitted to recaution the

This court has already recognized a distinction between the Anderson type case (like this one) and an ordinary situation where the declarant's confession is admissible, at least against himself. See United States v. Gottfried, supra, 165 F.2d at page 367, where we pointed out: "In Anderson v. United States, the confession had itself been unlawfully obtained, and was incompetent against the declarant; for that reason its admission resulted in a mistrial of the other accused."

2. Even if the confession were admissible, I think we should reverse and remand because of events which deprived defendants of a fair trial.[12]

(a) When the trial judge irrelevantly spoke in defense of American Relief for Italy, and indulged in a bit of what he later feared was "flag-waving," he did so by way of a rebuke to counsel for one of the defendants. The rebuke, I think, was undeserved. The question that elicited it was patently asked in the interests of the defendants. It is highly likely, then, that when the uncalled-for comment evoked applause from two jurors, those jurors were expressing enthusiastic sympathy with what they considered the judge's disapproval of the defendants.

Since the judge's indiscretion may well have induced a verdict against the defendants, it will not do, I think, to say that we will ignore the incident because the judge was only human. Of course, all judges are human, and therefore make mistakes. But as the mistake of the judge in this case may easily have harmed the defendants seriously, we should correct it by directing a new trial.[13] We should be humane as well as human. And since the defendants are languishing in jail and the trial judge is not,

they should be the object of our humaneness.

(b) On the second day of trial, the prosecutor held a "press conference" after court. He told the newspaper reporters of matters which (so he later advised the court) they promised not to print. In the next morning's New York Times, there appeared a story, told with typical journalistic vigor, about "export racketeers" who "poured $500,000 of commodities into European and South African black markets." The significance of the newspaper story was this: It professed to recount the testimony of a witness that Leviton, over the phone, had offered him a $200 bribe to withdraw from customs files a fraudulent declaration. The article detailed the attempted bribe, the meeting place for its completion and the substitution of a $44 gift of shirts for the originally-offered $200. This most damaging story of the $200 bribe is wholly unsupported by the evidence. Accordingly, had the prosecutor written letters to the jurors retelling this story, of course we would reverse. He did the equivalent. For it is outrightly conceded that the Times reporter learned this tale from the prosecutor, and that four copies of the newspaper article were found in the jury-room on the third day of the trial.

My colleagues admit that "trial by newspaper" is unfortunate. But they dismiss it as an unavoidable curse of metropolitan living (like, I suppose, crowded subways). They rely on the old "ritualistic admonition" to purge the record. The futility of that sort of exorcism is notorious. As I have elsewhere observed, it is like the Mark Twain story of the little boy who was told to stand in a corner and not to think of a white elephant.[14] Justice Jack-

---

jurors in his charge to consider the confessions binding against the declarants only. But see U. S. v. Haupt, 7 Cir., 136 F.2d 661, where the court reversed convictions based primarily on confederates' confessions despite limiting instructions by the trial judge both at the time of admission and in the charge.

12. It should be noted, however, that only the applause-evoking incident would seem to affect the conviction of Markowitz.

13. See McKahan v. Baltimore & Ohio R. Co., 223 Pa. 1, 72 A. 251, where a judgment against a railroad for negligence was reversed because an improper remark by the judge, to the effect that the railroad ought to have put a guard near the tracks, elicited applause from a single juror.

14. United States v. Antonelli Fireworks Co., 2 Cir., 155 F.2d 631, 656 (dissenting opinion).

son, in his concurring opinion in Krule-witch v. United States, 336 U.S. 440, 453, 69 S.Ct. 716, 723, 93 L.Ed. 790, said that, "The naive assumption that prejudicial effects can be overcome by instructions to the jury * * * all practicing lawyers know to be unmitigated fiction. See Skidmore v. Baltimore & Ohio R. Co., 2 Cir., 167 F.2d 54." Cf. People v. Carborano, 301 N.Y. 39, 42–43, 92 N.E.2d 871; People v. Robinson, 273 N.Y. 438, 445–446, 8 N.E. 2d 25.

I think the technique particularly objectionable and ineffective here for two reasons. (1) The story was a direct result of confidential disclosures by a government officer, the prosecutor, of not-in-the-record matters, and was not merely the accidental garbling of a confused reporter.[15] (2) The article was no statement of opinion or editorial, but a professed account of courtroom evidence calculated to confuse and mislead juror-readers. In such cases, courts recognize that, for all practical purposes, defendants are deprived of their constitutional rights to confront witnesses, cross-examine and contradict them, and to object to evidence as irrelevant or incompetent—in short all the elements of a fair trial. Last year, two Supreme Court Justices advocated in a concurring opinion the reversal of a conviction upon the ground that an officer of the court had released to the local press information about

confessions of the defendants never introduced at the trial. Shepherd v. Florida, 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740.[16]

I cannot see the relevance here of cases, to which my colleagues refer, applying the "clear and present danger" test to contempts by newspapers for articles relative to pending trials (incidentally, all non-jury trials). That test has been employed only when the newspaper itself was threatened with criminal punishment for the publication. It certainly should not be carried over to a case like this one where convicted defendants may well have been prejudiced by a newspaper article. In such a case, the "clear and present danger" test would bar reversals for all but the most flagrantly scurrilous or deceptive newspaper attacks. Courts, in reversing convictions for trial-by-newspaper, have always recognized that printed matter may be prejudicial enough to require a new trial without evidencing so depraved an attitude of the publisher as to support a contempt citation. United States v. Ogden, D.C.E.D. Pa., 105 F. 371, 374.[17]

In the instant case, the newspaper and reporter, if cited for contempt, would doubtless urge as a defense that the story came from the prosecutor, an "officer of the court." That very fact, however, underscores the gravity of the error here.

(c) I think that nothing said by defendants' counsel could justify the prosecutor's

15. "Mr. McAuley: These gentlemen (reporters) asked me to summarize the testimony, and I did, and they asked me how Leviton came to go to the restaurant in the first instance, at the St. James Bar, and I told them under no circumstances whatever—and I enjoined them very seriously—was any mention to be made of the reason why according to the witness he may have went up to the restaurant. I pressed that upon them three times. I think this man will bear me out."

Even the most ardent advocates of freedom of the press to report and comment on trials, stress the need for curbs on press releases during trial by attorneys on either side. See Note, 59 Yale L.J. 534, 545; Robbins, The Hauptmann Trial in the Light of English Criminal Procedure, 21 A. B. A. Journal 301 (1935).

16. "It is hard to imagine a more prejudicial influence than a press release by the officer of the court charged with defendants' custody stating that they had confessed, and here just such a statement, unsworn to, unseen, uncross-examined and uncontradicted, was conveyed by the press to the jury." Shepherd v. Florida, 341 U.S. 50, 52, 71 S.Ct. 549, 550, 95 L.Ed. 740.

17. Compare United States v. Keegan, 2 Cir., 141 F.2d 248, 258, cited by my colleagues, in which we refused to reverse a conviction because of a newspaper headline, "Bund Leaders Toss in Sponge at Draft Trial." In that case, there was no evidence that any juror had read the article, and the headline was obviously an editorial conclusion, not a comment on particular evidence or an account of purported evidence given in the trial.

statement to the jury—not supported by anything in the record—that Leviton had refused to testify before the grand jury. The statement was so perceptibly objectionable that it did not have to be called to the judge's attention. Moreover, the prosecutor, before and after this remark, told the jury of other matters not in evidence (including some of the circumstances of the alleged $200 bribe mentioned in the newspaper).

On account of item (a) or (b) or (c), standing alone, I would probably have voted for reversal. Together they leave me without doubt that justice demands a new trial.