## HAINES v. UNITED STATES.
### No. 12447.

United States Court of Appeals
Ninth Circuit.
April 17, 1951.
Rehearing Denied June 6, 1951.

Morris Lavine, Los Angeles, Cal., for appellant.

Ernest A. Tolin, U. S. Atty., Norman W. Neukom and Jack E. Hildreth, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before STEPHENS, BONE and ORR, Circuit Judges.

BONE, Circuit Judge.

Appellant was convicted on a counterfeiting charge laid under Sec. 471 of Title 18 U.S.C.A. He had previously entered a plea of guilty to this charge which plea was later set aside on his motion, a plea of not guilty ordered entered for him and the case set for trial. At a subsequent trial before the court, without a jury, appellant was found guilty and from the judgment of conviction this appeal was prosecuted.

## Specification of Errors

Appellant demands reversal of his conviction on the basis of three errors committed in the trial. The alleged errors are:

### I

The evidence was insufficient to support the verdicts. The verdicts were contrary to the law and the evidence.

### II

The court erred in receiving the alleged confessions in evidence both from the defendant (Government's Exhibit 15) and orally to the Deputy United States Attorney, Ray H. Kinnison prior to the arraignment of the defendant and prior to the time he was represented by any counsel or friend and after he had been questioned at length by Secret Service agents.

### III

The trial court erred in not granting a motion for a new trial to set aside the verdict which he had rendered without an intelligent or understanding waiver of trial by jury by the defendant.

## The Jury Waiver

A formal record entered at trial time on September 7, 1949 shows the appearance of appellant and his counsel in open court and in part recites that "the defendant being desirous of having the case tried before the court without a jury, now requests of the court that the case be so tried and hereby consents that the Court shall sit without a jury and hear and determine the charges against the defendant without a jury." This statement in a record styled "Waiver of Jury" was signed by appellant in open court. To the foregoing statement was appended a statement signed by his counsel in which she sets forth that she had advised appellant fully as to his rights and this statement carried counsel's assurance to the court that appellant's request for a trial without a jury "is understandingly made." The United States Attorney entered his consent in writing to appellant's request for trial before the court without a jury. After these formalities were noted of record the court indicated his approval of the waiver by his signature.

Appellant here contends that the trial judge approved his formal jury waiver without questioning defendant, or reaching any determination as to the facts set out in the printed (waiver) form filed with the court. This issue was presented for the first time when appellant appeared for sentence, at which time, among other matters, mitigation of sentence or probation was urged by his counsel for the reason that certain claimed extenuating circumstances (including an absence of "criminal tendencies") justified leniency. Upon this occasion the court referred to certain critical statements made by appellant regarding his jury waiver which appeared in the probation report and requested a "clarification" of these statements. The court stated that nobody had urged appellant to waive a jury; that the idea of waiver did not originate with the United States Attorney[1] or with the court, and the court's approval came only after appel-

1. During this inquiry the government attorney in charge of the case advised the court that at the time the jury waiver was signed the government had already

lant had signed the waiver in open court and only after it had been approved by counsel on both sides. Appellant was thereupon directed to indicate to the court the nature of the "confusion" which he claimed existed in his mind as to the voluntary character of his waiver, and the court announced that if appellant did not know what he was doing it would refuse to impose a sentence.

Trial counsel for appellant was then called and interrogated by the court and the substance of her statement to the court was that a week before the trial she had conferred with appellant regarding the desirability of having a jury and her advice was to waive a jury because of the facts he had given her and because she was satisfied that the judge would be fair and just. Two days before the trial, and again one day before the trial, the matter of a jury waiver was again presented to appellant by his counsel and appellant then advised counsel that he would leave the matter to her discretion and that her determination "was all right with him." His counsel again discussed the waiver matter with appellant on the morning the case was called for trial as a result of which the waiver was presented and signed in open court. Counsel also stated to the court that it was her opinion that she advised government counsel that a waiver would be filed.

When interrogated by the judge appellant stated that he "could not remember" the conversation with his counsel regarding a waiver—that he thought it was "an order to go ahead with the case." After this colloquy the trial judge stated that having witnessed all that went on in the court room at the time the waiver was signed he would not believe appellant's "explanation." From an inspection of the record we feel that the judge was fully justified in this conclusion.

■ To attach convincing weight to appellant's story would also impeach without just cause the intelligence and integrity of his counsel. She had given her personal assurance to the court that plaintiff's request for a non-jury trial was free and voluntary and made after he fully understood its meaning. Aside from this assurance, if the story of appellant is viewed in the most tolerant spirit and favorable light, it fails to carry the conviction of truth. Obviously it was rejected for this reason. We find no sound reason for condemning the action of the judge as an abuse of discretion in passing on such an issue. We cannot agree with (different) counsel appearing on this appeal who urges that the record reveals that appellant was ignorant of the significance of the waiver he signed. We are persuaded that the record fully refutes such a conclusion. The "ignorance" offered as an explanation probably appealed to the judge as being nothing but an afterthought—a conclusion we think is fully justified.

### The Evidence Does Not Support the Verdict

This issue is presented in the following claims:

1. The case was based primarily, if not entirely, on the testimony of one White, an alleged principal, who passed the counterfeit money and who tried to place the responsibility upon appellant.

2. Conversations of White in evidence showed White's extreme knowledge of how to make counterfeit bills. White's testimony shows the "lack of substantiality" required to convict in a federal court.

3. Federal courts have frowned upon a conviction where (as here) the principal offender (White) simply blames his aider and abettor.

4. Appellant recognizes the rule that the testimony of an accomplice in a federal court, if believed, is sufficient to sustain a conviction.

■ In substance and effect the foregoing claims are merely a demand that we

---

filed requested jury instructions but counsel for appellant came to government counsel just prior to the trial and requested permission to waive a jury, at which time appellant was present and readily agreed that this arrangement "would be fine," whereupon the government's proposed instructions were withdrawn.

weigh the evidence to determine whether the trial judge was justified (upon a consideration of all of the relevant, competent and credible evidence) in concluding that it was substantial and established the guilt of appellant beyond a reasonable doubt. He thought that the evidence was sufficient and so do we, and on such a fact issue his judgment must control. Furthermore, the reference to the weight a court must give the testimony of an accomplice requires no comment—the trial judge was quite well aware of the nature of such testimony and no showing of actual legal prejudices because of it, is made. Here the court indicated that it thought that White's testimony was not only credible but was also corroborated by facts in this case. This specification of error is without merit.

### The Confessions

Appellant's major contention on this appeal is that he was wrongly convicted because two confessions were received in evidence (without objection) which should have been rejected by the court. In summary his argument is:

1. The oral confession made to Kinnison, a United States attorney, and the oral and written confession made to Eliason, a Secret Service officer, were made and/or received prior to his arraignment before a magistrate.

2. *None* of his "rights" were sought to be protected prior to the taking of these confessions.

3. When the written statement was admitted in evidence the trial judge "took no precautions" to determine whether the statement was "free and voluntarily secured" as required by the Fifth Amendment.

4. Eliason "posed as a friend" of appellant after making the arrest on March 3, 1949 and (thus) secured the written confession.

Because the circumstances attending the apprehension of appellant and the sequence of events leading up to and including the making of the confessions constitute the factual basis of the foregoing contention we summarize the pertinent facts relating thereto as they clearly appear in the record.

Appellant was arrested by Secret Service Agent Carl Eliason between 9 and 10 A.M. on March 3, 1949 at which time he knew that Eliason was acting in an official capacity. Eliason promptly admonished him that he had the right to remain silent but if he made a statement it could be used against him. He was immediately taken to the office of the Secret Service in the Federal Building in Los Angeles and upon arrival there was questioned by Eliason. Polenz and Wasson, two officers in the same service were present during part of this inquiry. Appellant thereupon made a statement to Eliason in which he described his participation in counterfeiting activities with one White. In summary his oral statement to Eliason was as follows:

Through an ex-convict, appellant became acquainted with White (another ex-convict) in January, 1948. Appellant told White that he had for some time been experimenting with a photographic process for counterfeiting notes and he requested White to help him and the experiments were thereafter carried on in appellant's home by both men. Other (innocent) parties had given appellant some "technical advice" about his photography problem. White and appellant secured a "laboratory" where a negative of a $100 bill was made by one or the other, or both working together on this operation. A "print" of a spurious bill was made in appellant's home and turned over to White to "pass."

During the course of this interrogation appellant was asked to remove the contents of his pockets—some memorandums apparently descriptive of photographic processes were produced, and these were later used as evidence in the trial.

Appellant told officers that two or three negatives of the spurious $100 bill were concealed in the laboratory and then he was asked by the officers to go with them to the office of the United States Attorney to ascertain the advisability of securing a search warrant for the laboratory. Immediately after entering the office of the

attorney appellant asked what his chances for probation might be. He was then warned by the attorney that any statement he made might be used in evidence after which warning he repeated the substance of the story he had previously related to the officers concerning his counterfeiting activities. While in the office of the attorney he was shown four counterfeit $100 bills [2] (all made from the same negative and all identical with the exception of the serial numbers) and appellant identified them as notes made by him and White.

In the evening of the same day and while at the Federal Building, appellant was asked if he was willing to sign a statement which set forth the facts he had given to Eliason and Kinnison early that morning. When he indicated his willingness to do so the statement was typed by Eliason and after reading it appellant signed it. The document was in evidence at the trial. Since it merely embodied the facts appellant had related to Eliason and Kinnison immediately after his arrest the view of the court concerning it is best stated in the court's own language. The court said: "When to that [the 'that' being a reference to the testimony of White and White's wife] you add the full confession, the admissions, which of course he repudiates now, but the admissions before Mr. Kinnison at a time when he cannot possibly claim that he was in a daze and tired out and weary after long talking and questioning, and the contradictions in his testimony, the evasive answers, there is more than sufficient. He didn't answer one question in a straightforward manner from that witness stand, except when he was asked to deny a thing."

This summation by the court of the evidence which influenced its decision renders the admission of the written confession no more than cumulative and, hence, obviously not prejudicial.

Appellant was "booked" in the Los Angeles County Jail on a charge of counterfeiting right after signing this statement and arraigned the following day (March 4, 1949) before a United States Commissioner.

The contention stressed here is that the confessions were involuntary because they were made and received before arraignment. Their voluntary character is not otherwise seriously questioned. In fact appellant's testimony at the trial emphasized that his relations with the Secret Service officers were friendly and free from any aspect of coercion. Nor is it contended or suggested that the Kinnison incident reveals any form or suggestion of coercion, or the use of inducements or promises to secure a confession. No objection was made to the introduction into evidence of the confessions. However, such admission is assigned as error here.

The controlling issue before us is: Does the doctrine announced in the Upshaw case (Upshaw v. United States), 335 U.S. 401, 69 S.Ct. 170, 93 L.Ed. 100, require us to hold that the *bare fact* that the officers failed to arraign appellant *prior* to receiving his voluntary confessions made these confessions inadmissible at his trial? Such a requirement, if it be an inflexible requirement, would of course make the *timing* of the confessions control the question of admissibility. If for this one reason they were improperly admitted in evidence a new trial must be ordered and the importance of this issue justifies comment at some length.

Many situations will inevitably arise where application of such an exclusory rule of evidence would produce more than questionable results. If immediately after his arrest and after full and fair warning as to his legal rights and advice that any admissions would be used against him, a detainee not acting under coercion and not responding to questionable and forbidden inducements of any sort *desired* to and did make a formal confession of guilt prior to arraignment, that confession would have to be denied admission as evidence upon the *sole* ground that officers *received it before arraignment*. If Rule 5 of the Rules of Criminal Procedure, 18

2. Introduced in evidence at the trial.

U.S.C.A., is to be given a construction which calls for rejection of such a confession we would have to reach the dubious conclusion that a detainee has absolutely no legal right to make that sort of a free choice—no legal right to voluntarily confess prior to an arraignment on a federal charge.

■ We find ourselves unwilling to accept the view that the processes of law enforcement are in the straitjacket suggested in the preceding paragraph. Such a theory overlooks the fact that any normal person has a right to waive many Constitutional rights and this right would include the right to (thus) voluntarily and understandingly incriminate himself in the face of a plain and fair warning that any incriminating statements would be used against him. If a detainee then voluntarily makes incriminating statements he is in no different position than if he later voluntarily elected to make statements of that character on the witness stand. Moreover, his right to refuse to incriminate himself by his answers is a "right" personal to him and must be asserted by him— it may not even be claimed for him by his attorney. See comments on this rule in Schoeps v. Carmichael, 9 Cir., 177 F.2d 391.

The same dubious results would follow where a voluntary confession was made to officers and the time and place of the confession were such as to make it *physically impossible* to convey the prisoner to a distant magistrate *before* he made his confession. Cf. Janus v. United States ex rel. Humphrey, 9 Cir., 38 F.2d 431, 437. And see comments in Symons v. United States, 9 Cir., 178 F.2d 615, certiorari denied, 339 U.S. 985, 70 S.Ct. 1006. In the instances we have noted above the *timing* of a confession would have to be regarded as of more importance to the law than either the *truth* or the *voluntary character* of the confession—a situation with mournful shadings and one not calculated to inspire judicial enthusiasm for a rule which produced such unhappy results. Yet this is the rule of evidence which appellant urges us to apply in the instant case. Courts can hardly expect officers to *refuse* to accept voluntary confessions tendered under the circumstances we have noted. And we might add that we are not aware of any rule of law which forbids an officer to advise a prisoner that he is free to make a truthful confession at any time if he so desires.

We have suggested these possible complications in confession cases to illustrate the great confusion and uncertainty which will surely confront courts if they are *compelled* to apply this *timing* rule without consideration of other pertinent factors. Unless and until by its action Congress makes abundantly plain that this is the inflexible rule it approves in confession cases we prefer to adopt the sensible view that the weird and unconscionable results we have noted should not be tolerated.

We emphasize that this is not a case in which we face the necessity of considering and weighing a claim that the orthodox Constitutional "rights" of a detainee have been violated. Here we deal with operations of a man who does not assert a Constitutional right to engage in the criminal activities so clearly revealed by the evidence. On the contrary appellant relies only upon a technical rule of evidence which he asserts gives him immunity from conviction and punishment regardless of the fact that he had voluntarily confessed to engaging in his counterfeiting activities.

This court recently stated in Carignan v. United States, 9 Cir., 185 F.2d 954, 957, that "cases of this type do not yield to uniform treatment, but that each is to be considered in its own setting and in light of its peculiar circumstances," a statement which wisely emphasizes the need of careful evaluation of fact situations related to receipt of confessions. In the Carignan case the accused had been taken into custody and arraigned on a charge of assault with intent to commit rape on one Norton. While being held to answer on this charge he was interrogated by the Marshal concerning the murder of Mrs. Showalter and the Marshal succeeded in inducing the accused to confess to the murder. During the period of conferences between the accused and the Marshal (which covered the major portions of Sat-

urday and the following Monday) the accused was not taken before a magistrate and arraigned on this more serious charge. We held that admission of his confession was error under the doctrine of the Upshaw case and McNabb case (McNabb v. United States), 318 U.S. 332, 63 S.Ct. 608, 87 L. Ed. 819.

In the prevailing opinion (by Judge Healy) it was said: "It can not fairly be said that the confession here obtained did not involve 'use by the Government of the fruits of wrongdoing by its officers.' [citing the Upshaw case] It was not impracticable to arraign Carignan before a magistrate on the murder charge of which he was more than suspected, and there was abundant time and opportunity to do that. Nor, keeping in mind the totality of the circumstances, can one say that such procedure, plus the filing of the formal complaint made mandatory by the rule, would have proved a mere idle ceremony. * * *" The "totality of the circumstances" was thus stressed in this case. We were careful to point out that the *purpose* of the Marshal "forbade even the mention of * * * counsel"—again a pointed reference to the facts peculiar to that case. The decisive conclusion reached in the prevailing opinion was that the detention and questioning of Carignan *after* his arraignment on the Norton rape charge was *coercive* in that it was plainly employed for the *purpose* of securing, if possible, a confession in the Showalter matter, and that *this purpose* was coupled with an *unreasonable delay* in arraigning Carignan (in this case a failure to arraign). These and the other incidents which made up "the totality of the circumstances," were thought to make his confession inadmissible, and the ultimate decision was posited upon this view of the law and not upon the bare assumption that Carignan's confession automatically became inadmissible for the *sole* reason that it was *received* prior to an arraignment.

The aggregate of the facts in the instant case present an entirely different picture than the one before us in the Carignan case. In the Carignan case we could find no rational reason for delay in arraignment; while in the case before us, as we will later point out, the circumstances warranted such a brief delay—one founded in practical necessity. The above considerations and other factual differences form the real, vital and significant factor which leads us to reach a conclusion opposite to that reached in the Carignan case. As Judge Healy suggested in the Carignan opinion, the facts of each case must be considered in their own setting and in light of all the circumstances of the case and it is precisely this sort of appraisal of pertinent facts which leads to the conclusion we have reached in this case.

In the McNabb case, supra, 318 U.S. at page 346, 63 S.Ct. at page 615, the Court said that the mere fact that one makes a confession while in the custody of the police does not render the confession inadmissible. Apparently the decision did not go so far as to hold that a voluntary confession given *prior* to arraignment *must* be considered inadmissible *solely* on that account. So that door remains open. The Court held, 318 U.S. at page 347, 63 S.Ct. at page 616, that a conviction ought not to stand when based *"upon evidence secured under the circumstances revealed here"* and obviously this sort of language was employed to express condemnation of the "method" employed to secure the confession in that case—a long and exhaustive interrogation of the prisoners which was carried on in a hostile atmosphere by several officers over a period of two days. They were questioned at night and one of the prisoners, the last one who surrendered, was stripped and questioned for five or six hours.

Incidents of the oppressive nature shown in the McNabb case are wholly absent in the instant case and its facts do not even faintly resemble the McNabb situation. The most critical and captious examination of the record in the case before us would fail to reveal that the officers and the United States attorney substituted brutality for brains. Appellant himself specifically and definitely rejects such a view of their conduct and the "circumstances" clearly revealed by the evidence conclusively repels it.

The testimony in the case at bar fails to provide even an inference that an "illegal detention" was deliberately resorted to as a *means,* or for the *purpose* of, extorting a confession or that the confessions in this case were *due* to failure promptly to take appellant before a committing magistrate. Nothing in the record supports the view that the confessions were the *fruit* of a deliberate "detention" having for its purpose the securing of a confession. The facts in this case clearly show that appellant made a voluntary oral confession (complete in its details) immediately after he arrived at Eliason's office on the morning of his arrest. His later written statement was no more than a repetition of the facts he had given Eliason in this oral confession. The situation bears resemblance to that shown in United States v. Mitchell, 322 U.S. 65, 64 S.Ct. 896, 88 L. Ed. 1140.

■ In the face of these impressive and convincing circumstances we are unable to conclude that we *must* hold, as a matter of law, that the *bare failure* to have appellant *immediately* arraigned after his arrest on March 3rd automatically translated the short questioning period which immediately followed his arrest into an "illegal detention" the effect of which was to invalidate the oral confession then made (which was later typed for his signature) and also invalidated the oral confession which he almost immediately thereafter made to the United States Attorney.

## Rule 5 Considered

■ The Rules of Criminal Procedure became effective only with the approval of Congress—an approval which was evidenced by its failure to reject them in whole or in part. But this sort of approval is a far cry from a blanket Congressional endorsement of *an interpretation* of Rule 5 which works out the fantastic results we have described. The wording of Rule 5 would carry no conviction to the minds of our federal legislators that the rule was deliberately fashioned to fatally taint a voluntary confession for the *sole reason* that it was *received* prior to an arraignment. Those familiar with Congressional processes may readily imagine the probable result, so far as approval went, had that body been frankly advised that Rule 5 was actually intended to create the sort of procrustean bed for law enforcing and prosecuting officials which is here described and which is suggested by appellant. The criminal element would enthusiastically welcome adoption of such a theory of law since it would go a long way toward stifling all inquiries which might legitimately lead to conviction of law violators. The plain and simple requirement of Rule 5 is that the arrested person be taken before the magistrate "without unnecessary delay" and so the question we must face is whether the delay in arraigning appellant until the next day was *reasonably necessary* in order to give the officials here involved an opportunity to check on and verify the available facts he had given them, this in order to determine whether justice and reason called for filing a criminal charge against him. It must be remembered that in a preliminary hearing before a federal magistrate some specific fact or facts indicating guilt must be produced by the officer or officers who secured such facts in order that one charged with a crime may be bound over for trial. It appeared that a new tenant was that very day moving into the Diehl laboratory where some of the counterfeiting operations had been carried on. The problem before the officers was whether to delay the arraignment of appellant long enough to go with appellant to the laboratory building in an effort to locate the negatives which appellant had said were there or proceed with the arraignment at once and run the risk of losing valuable evidence which would tend to prove, or disprove the truth of appellant's story and put the officers on a more solid footing of fact (one way or the other) in charging him with a crime before the magistrate.

Even if we adopted and applied the theory of law urged upon us by appellant the delay in arraignment here shown could not in any way have prejudiced him or weakened his position. His argument is that his confessions become inadmissible

at trial for the *sole reason that they were received prior to arraignment,* i. e., almost immediately after his arrest. In short, any admission received *after* arrest, and *prior* to an arraignment, was inadmissible. Of course if this view is sound his later arraignment has absolutely no significance in law so far as the instant confessions are concerned.

We have indicated that we do not agree with the contention of appellant above noted. We think that the *time* of the arraignment, in light of all of the facts in this case, is very significant and that these facts point up the reasonable necessity for a delay in arraignment—a delay that does not render his confessions inadmissible. The able trial judge must have been so persuaded else he would have rejected the confessions for the reason urged by appellant. We do not think that a judicial consideration of the practical necessities (as in this case) which inevitably arise in the work of apprehending criminals is a practice not to be tolerated in federal courts. Plain common sense should invite a court to carefully appraise the situation confronting officers and this would include a survey of the facts to see if they spelled out good faith on the part of the officers in delaying an arraignment.

It is a rational assumption that members of Congress are quite as concerned over protection of human rights as are the courts. They evidently saw nothing menacing to society in the Rule 5 words and obviously realized that a large number of cases would constantly arise where the facts revealed that some delay in arraignment was reasonably *necessary* if the legitimate aims and purposes of criminal law were to be intelligently served. They were well aware that they were dealing with a rule of evidence and not a statutory device to implement the Constitutional mandate against compelled confessions.

■■■■ We are persuaded that Congress, in approving Rule 5, did not thereby intend to entirely exclude judicial consideration and review of the *reasonableness* of a delay in arraignment—otherwise what pos-sible reason led to the employment of the simple but expressive language embodied in that Rule? To ask the question is to answer it. *"Without unnecessary delay"* means exactly what it says or it is a mere jumble of words void of meaning. Where a delay in arraignment is shown and a question as to its validity is raised then and in that event the issue of a reasonable necessity for delay should be judicially determined (possibly in the same manner by which the admissibility of a confession is determined) by an inquiry into all of the pertinent facts connected with the detention. This sort of a disposition of such an issue in a court of law by its usual processes is sensible and would present no formidable problem—courts and juries are constantly meeting more complicated problems of proof every day. And it is suggested that the language of Rule 5, if used in most federal statutes would be regarded by the average lawyer as an open invitation to seek a judicial review where an abuse of the "unnecessary" mandate could be shown. (It is of course assumed that a confession obtained by coercive or other forbidden tactics during such a necessary delay in arraignment would not be admissible.)

A brief reference to some of the practical and everyday aspects of the problem of questioning detained persons is also in order. In innumerable cases persons detained and quizzed by law officers promptly produce facts which lead to their immediate release. (Certainly it cannot be argued that producing *exculpatory* facts would or could incriminate or tend to incriminate such a detainee.) Every experienced lawyer knows this to be true. A further consideration is that conscientious law enforcing officials find it necessary to consider and weigh the possibility of the great harm and public scandal that would surely be visited upon an innocent man if he was carelessly charged with a crime and immediately arraigned before a magistrate before he could have his own claims, and the facts they might bring to light, checked by responsible officers. Any course of action short of this suggests thoughtless haste—in fact it might be an

act of wanton cruelty against a guiltless person. Lawyer members of Congress are quite well aware that careful officers try to make sure of their facts before they file a criminal charge against a person—such an action invites a damage suit against the officer if an innocent person is victimized by a false charge.

The careful prosecuting attorney is in the same boat—he too wants to be sure that he is not incontinently rushed into filing a complaint where a simple showing that might be made by a detainee would leave an honest doubt in his mind which called for more investigation, or convince him that not filing a charge would be the just and honorable course. Every man who has had experience with law enforcing agencies or as a prosecuting officer is fully acquainted with this rational and necessary process of eliminating suspects who are innocent. Should we say that such preliminary "checks" made by cautious officials are intolerable in the eyes of the law and that such a practical idea of inquiry was far from the minds of the legislators when by no adverse action they sanctioned the new Rules of Criminal Procedure? We think not.

The apprehension of criminals and suppression of crime are vitally necessary processes and while they present some unpleasant aspects to those who prefer to avoid a close contemplation of our serious crime problem, they must go on if the public is to retain any hope of enjoying a reasonable measure of protection from criminals. We confront the grim fact that our law enforcing agencies alone stand between the law abiding and those who viciously prey upon them. Without this protection decent citizens would become helpless victims of all sorts of criminality.

A consideration of all of the facts and circumstances convinces us that appellant's confessions were properly admitted in evidence. He had a fair trial before not only an experienced judge but one whose inclination is to "lean backward" to insure justice in cases involving personal rights. The judgment should be affirmed and it is so ordered.

STEPHENS, Circuit Judge.

I dissent. Judge BONE presents a powerful argument in support of his conclusion. It seems to me, though, that the United States Supreme Court has left no area for discretion to the lower courts in the subject of admitting confessions into evidence which have been given by persons while under police detention and while being intentionally withheld from presentment to a magistrate.

Rehearing denied; STEPHENS, Circuit Judge, dissenting.