Everett D. GREEN, Appellant,

v.

UNITED STATES of America, Appellee.

No. 12809.

United States Court of Appeals District of Columbia Circuit.

Reargued before Court in Banc May 8, 1956.

Decided June 28, 1956.

Writ of Certiorari Granted Nov. 19, 1956. See 77 S.Ct. 217.

Messrs. George Blow and George Rublee, II, Washington, D. C. (both appointed by this Court), with whom Mr. Charles E. Ford, Washington, D. C. (appointed by the District Court) was on the brief, for appellant.

Mr. Harold Greene, Asst. U. S. Atty., for appellee. Messrs. Leo A. Rover, U. S. Atty., at the time brief was filed, and Thomas A. Flannery and Lewis Carroll, Asst. U. S. Attys., were on the brief for appellee. Mr. Oliver Gasch, U. S. Atty., also entered an appearance for appellee.

Before EDGERTON, Chief Judge, and PRETTYMAN, WILBUR K. MILLER, BAZELON, FAHY, WASHINGTON, DANAHER, BASTIAN and BURGER, Circuit Judges.

WILBUR K. MILLER, Circuit Judge.

This case is here for the second time. On the first appeal Green's conviction of second degree murder under the second count of an indictment, which count charged murder in the first degree done in the perpetration of arson,[1] was reversed. 1955, 95 U.S.App.D.C. 45, 218 F. 2d 856. Because "all the testimony as to what occurred in the burning house pointed to murder in the first degree and nothing else," this court held the trial judge erred in giving a second de-

---

1. The first count charged arson only and will be noticed *infra*.

gree instruction. We were concerned, however, at the obvious risk Green was running in successfully appealing from the second degree murder conviction but were assured he was aware of it. With respect to this we said in the opinion, 95 U.S.App.D.C. at page 48, 218 F.2d at page 859:

"* * * In seeking a new trial at which—if the evidence is substantially as before—the jury will have no choice except to find him guilty of first degree murder or to acquit him, Green is manifestly taking a desperate chance. He may suffer the death penalty. At oral argument we inquired of his counsel whether Green clearly understood the possible consequence of success on this appeal, and were told the appellant, who is 64 years of age, says he prefers death to spending the rest of his life in prison. He is entitled to a new trial."

After remand, Green was tried again under the first degree murder charge. As the evidence was substantially the same as before, the trial judge of course did not instruct on second degree murder. This time the jury found him guilty of murder in the first degree, and he again appeals.

Counsel appointed to represent appellant have ably presented his case in briefs and in oral argument. They rely, first, on double jeopardy. Their theory is that when the jury at the first trial found Green guilty of murder in the second degree, it acquitted him of first degree murder; that he could not be tried again on a charge of which he had been acquitted, and his defense of former acquittal asserted at the second trial should have been sustained.

■ Where the accused successfully seeks review of a conviction, there is no double jeopardy upon a new trial for the offense of which he was previously convicted. United States v. Ball, 1896, 163 U.S. 662, 672, 16 S.Ct. 1192, 41 L.Ed. 300; State ex rel. Francis v. Resweber, 1947, 329 U.S. 459, 462, 67 S.Ct. 374, 91 L.Ed. 422. This principle is not disputed

by counsel. But the question here has an additional element and may be stated thus: Where one is convicted, not of the crime charged in the indictment under which he was tried but of a lesser included offense, and on his appeal the conviction is reversed and he is granted a new trial, may he be tried again for the crime charged in the indictment, or must the new trial be confined to the lesser offense of which he was first convicted?

This question was presented to the Supreme Court in Trono v. United States, Dec. 4, 1905, 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292, a case which arose in the Philippine Islands. Mr. Justice Peckham, who wrote the principal opinion, said [199 U.S. at page 530, 26 S.Ct. at page 123]:

"This question has given rise to' much diversity of opinion in the various state courts. Many of them have held that the new trial must be confined to the lesser offense of which the accused had been convicted on the first trial, while other courts have held precisely the contrary, and that upon a new trial the whole case was open as if there had been no former trial. * * * "

After discussing some of the cases, Mr. Justice Peckham reached this conclusion, 199 U.S. at pages 533–534, 26 S.Ct. at page 124:

"In our opinion the better doctrine is that which does not limit the court or jury, upon a new trial, to a consideration of the question of guilt of the lower offense of which the accused was convicted on the first trial, but that the reversal of the judgment of conviction opens up the whole controversy and acts upon the original judgment as if it had never been. The accused by his own action has obtained a reversal of the whole judgment, and we see no reason why he should not, upon a new trial, be proceeded against as if no trial had previously taken place. * * *

"* * * When at his own request he has obtained a new trial

he must take the burden with the benefit, and go back for a new trial of the whole case. * * * "

Counsel for appellant say the Peckham Trono opinion is not that of the Supreme Court. They characterize it as "a four to four opinion, with Mr. Justice Holmes concurring only in the result reached by the first four * * *." Four justices did indeed dissent, and Mr. Justice Holmes was noted as "concurring in the result." The result flowed directly and solely from the Peckham conclusion that " * * * the better doctrine is that which does not limit the court or jury, upon a new trial, to a consideration of the question of guilt of the lower offense of which the accused was convicted on the first trial * * *." If Mr. Justice Holmes had not thought that "the better doctrine", he could not have concurred in the result.

Moreover, some 18 months before the Trono decision, the distinguished Holmes had affirmatively asserted that to be the better doctrine. Dissenting in Kepner v. United States, May 31, 1904, 195 U.S. 100, 134, at pages 135–136, 24 S.Ct. 797, at page 807, 49 L.Ed. 114, he said:

"It might be said that when the prisoner takes exceptions he only is trying to get rid of a jeopardy that already exists—that so far as the verdict is in his favor, as when he is found guilty of manslaughter upon an indictment for murder, according to some decisions he will keep it and can be retried only for the less offense, so that the jeopardy only is continued to the extent that it already has been determined against him, and is continued with a chance of escape. I believe the decisions referred to to be wrong * * *."

We see no reason to suppose that 18 months later Mr. Justice Holmes had abandoned this view but nevertheless concurred in the Trono result which depended upon it.

So, whatever it was in the Peckham opinion with which the great justice did not agree, we are sure it was not Peckham's choice of "the better doctrine," a result in which he expressly concurred. Thus the Peckham holding which is applicable here must have been the holding of a majority of the Supreme Court. Probably that is why in the official report it is said, 199 U.S. at page 528, 26 S.Ct. at page 122, "Mr. Justice Peckham, after making the foregoing statement, delivered *the opinion of the court.*" [Emphasis supplied.] And why Mr. Justice Harlan, dissenting, referred, 199 U.S. at page 536, 26 S.Ct. at page 127, to Peckham's opinion as "the opinion and judgment of the court * * *." And why in several subsequent citations the Supreme Court and lesser tribunals have so regarded it.[2]

Appellant's counsel insist the Trono decision set a precedent only for cases arising in the Philippines, and that it has no application here. They contend the Fifth Amendment's prohibition against double jeopardy did not extend to the Islands, and that therefore the Trono ruling has no application to continental cases involving the Amendment. This theory seems to us untenable. In the Trono case the Court was considering the effect of a Congressional enactment that in the Philippines "no person for the same offense shall be twice put in jeopardy of punishment. * * *"[3] This is exactly the same as the double jeopardy provision of the Fifth Amendment, as the Court had held in the then recent case of Kepner v. United States, 1904, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114.[4] Hence what the Court said in the Trono opinion with regard to the provi-

---

2. E. g., Burton v. United States, 1906, 202 U.S. 344, 378, 26 S.Ct. 688, 50 L.Ed. 1057; Stroud v. United States, 1919, 251 U.S. 15, 18, 40 S.Ct. 50, 64 L.Ed. 103; Bryan v. United States, 1950, 338 U.S. 552, 560, 70 S.Ct. 317, 94 L.Ed. 355; Miller v. United States, 5 Cir., 1955, 224 F.2d 561, 562.

3. Section 5 of an Act of July 1, 1902, 32 Stat. c. 1369, 691, 692, which extended to the Philippine Islands certain of our Constitutional guaranties.

4. See also Gavieres v. United States, 1911, 220 U.S. 338, 341, 31 S.Ct. 421, 55 L.Ed. 489.

sion of the Philippine statute necessarily applied to the pertinent provision of the Fifth Amendment, which has identical significance. And Mr. Justice Holmes was of that opinion, for he said in his Kepner dissent, 195 U.S. at page 134, 24 S.Ct. at page 806:

"* * * The case is of great importance, not only in its immediate bearing upon the administration of justice in the Philippines, but, since the words used in the Act of Congress are also in the Constitution, even more because the decision necessarily will carry with it an interpretation of the latter instrument. * * *"

Thus we see why the Trono opinion says, "We may regard the question as thus presented as the same as if it arose in one of the Federal courts in this country * * *." 199 U.S. at page 530, 26 S.Ct. at page 123, 50 L.Ed. 292.

■ Counsel say this statement is *dictum;* that it is not and should not be binding on a federal court. Whether so or not, the statement was a deliberate expression of opinion which we think we may not disregard; moreover, it is one with which we agree. The Trono opinion's choice of "the better doctrine" with respect to the double jeopardy question under discussion was a ruling on a right not only guaranteed by the Philippine statute but also by the Fifth Amendment. We see no reason why it should not have general application wherever the Constitution reaches. We conclude that the Trono case is authoritative and requires us to hold that Green was not subjected to double jeopardy when, upon remand, he was tried for murder in the first degree.

■ But the reliance of diligent counsel upon the defense of former jeopardy does not stop with the plea of *autrefois acquit* which we have discussed and rejected in the foregoing portion of this opinion. They point out that at the first trial he was convicted under the arson

count and did not appeal. Since there was only one act of arson, counsel say, "An unappealed conviction of arson bars subsequent prosecution for felony murder [5] arising out of the arson." The contention is based on State v. Cooper, 1833, 13 N.J.L. 361, 25 Am.Dec. 490, which is said to have "established" the proposition for which counsel argue.

We cannot accept the Cooper case as binding authority. In Carter v. McClaughry, 1902, 183 U.S. 365, 395, 22 S.Ct. 181, 46 L.Ed. 236, and in Gavieres v. United States, 1911, 220 U.S. 338, 342, 31 S.Ct. 421, 422, 55 L.Ed. 489, the Supreme Court quoted with approval the following excerpt from Morey v. Commonwealth, 108 Mass. 433, in which the Supreme Judicial Court of Massachusetts, speaking by Judge Gray, held:

"'A conviction or acquittal upon one indictment is no bar to a subsequent conviction and sentence upon another, unless the evidence required to support a conviction upon one of them would have been sufficient to warrant a conviction upon the other. The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense. A single act may be an offense against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other.'"

Again, in Morgan v. Devine, 1915, 237 U.S. 632, 641, 35 S.Ct. 712, 715, 59 L.Ed. 1153, the Supreme Court said:

"* * * [T]his court has settled that the test of identity of offenses is whether the same evidence is required to sustain them; if not, then the fact that both charges relate to and grow out of one transaction does not make a single offense where two are defined by the statutes. * * *"

---

5. They use this term to denote the crime committed by him who kills another in the perpetration or attempted perpetra-

tion of one of those felonies enumerated in the statute, which makes such a killing murder in the first degree.

Following this, the Carter and Gavieres opinions were cited with approval.

"Applying these principles," the Supreme Court said in the Gavieres case, 220 U.S. at page 343, 31 S.Ct. at page 423, 55 L.Ed. 489, "it is apparent that evidence sufficient for conviction under the first charge would not have convicted under the second indictment." It is equally plain in the present case that evidence sufficient to convict Green of arson under the first count would not have convicted him of murder under the second, which required proof that the death of a human being was caused by the arson. Hence, the conviction of arson did not preclude later prosecution for and conviction of murder committed in the perpetration of the arson.

Appellant's counsel invoke the McNabb rule [6] because certain statements Green made to police officers and a fire inspector while he was in a hospital and before he had been arraigned were used to contradict in some respects his testimony at the trial. There was no confession. We think it clear that the McNabb rule does not apply in this case but, as two of our dissenting colleagues think otherwise, we shall discuss the facts involved.

For some time prior to Tuesday, May 26, 1953, Miss Betty Brown, who was 83 years old and in ill health, had shared a house with and been cared for by the appellant. In response to an alarm, fire apparatus arrived at the house about 7:40 a. m. on that Tuesday. After breaking into the house, firemen not only discovered flames but also found Miss Brown dead in her bed, and found Green lying face down in a bathtub, suffering from superficial stab wounds on the upper part of his body and from inhalation of smoke.

After reviving Green with oxygen, the firemen removed him to Emergency Hospital, where he was received about 8:00 a. m. and was given medical attention. Police Sgt. Couture, who knew nothing about the facts except that Green and Miss Brown's body had been found in the burning building, went to Emergency Hospital about 8:30 a. m. and asked him what had occurred. The officer later testified at the trial that Green, who was quite rational and "talked good," told him he awoke about 7:00 a. m., smelled smoke, and went to the basement to investigate. There he was attacked, he said, by a tall, bald-headed colored man who stabbed him several times with a long dagger; that after a short interval of unconsciousness he (Green) dragged himself to the bathtub where the firemen found him.

Couture testified further that about 10:00 a. m. Tuesday he returned to Emergency Hospital accompanied by Sgt. Clark and again talked with Green. They asked him how he accounted for the fact that there were five separate fires, to which he replied that the colored man must have set them. Asked how the latter had escaped from the house that was so tightly closed the firemen had to break in, he offered no explanation. The officers had found pencils and an open box of stationery on a kitchen table; they asked Green if he had been writing letters, to which he replied he had not. Later that day, Tuesday, Green was taken in an ambulance from Emergency Hospital to District of Columbia General Hospital, where he was admitted at 2:10 p. m. and placed in a locked ward with about a dozen other patients. A policeman was on guard outside the door. About 3:00 p. m. Tuesday a fire inspector questioned Green, who told him substantially the same story he had recited to Sgts. Couture and Clark that morning at 10:00 o'clock. There was no further interrogation of the appellant on Tuesday, May 26, and none at all on Wednesday, May 27.

During the evening of Wednesday, May 27, a Mrs. Anthony, an acquaintance of Green, turned over to the police a letter from him which she had received in that day's mail, together with two $20.00 bills which had been enclosed with it. The envelope was postmarked Washing-

6. McNabb v. United States, 1943, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819.

ton, D. C., May 26—12:30 p. m.—1953. The letter read:

"Tuesday A. M. Please notify W. T. Thompson, Fredericksburg, Virginia, of Miss Betty Brown's death. A fine and good lady, a true friend to me. We both want it this way. Good-bye, my friend. /s/ Everett.

"Please have my ashes thrown on the Chesapeake Bay. (Okay.) The inclosed is for flowers for her."

Because of the discovery of this letter, Sgts. Couture and Clark and the fire inspector returned to the General Hospital at 9:30 a. m., Thursday, May 28, and again interviewed Green. He readily admitted having written the letter to Mrs. Anthony, and explained it by saying he had gone to bed about midnight but was restless and at 12:30 a. m. (Tuesday, May 26) went to see how Miss Brown was. Finding she was dead, he contemplated suicide and wrote the letter to Mrs. Anthony, mailed it in a nearby box, and went to bed. He then repeated what he had previously said about going to the smoke-filled basement some hours later that morning and there meeting a colored man who attacked him. Shortly after this interview and at 11:00 a. m. Thursday, May 28, the medical authorities permitted the police to take Green from the hospital to the coroner, who conducted a preliminary examination and held him to await the action of the grand jury.

■ The statements attributed to Green by the police sergeants and the fire inspector in their testimony concerning the three interviews with him on Tuesday, and the fourth on Thursday morning, are those which appellant and two of our dissenting brothers say were received in violation of the McNabb rule. Green was not prejudiced by the admission of evidence concerning the Thursday morning statement in which he admitted writing the letter to Mrs. Anthony and explained it by saying it was written after he had discovered at 12:30 a. m. that Miss Brown was dead; for in his testimony at the trial he adhered to his Thursday morning statement.

■ This brings us to the three statements made by the appellant on Tuesday, the day of the fire. We observe that when Green talked to Sgt. Couture at 8:30 that morning and to him and Sgt. Clark an hour and a half later, he had not been arrested, was not in the custody of the police, and was not under surveillance by them. He was in Emergency Hospital and there was no policeman there guarding him. It is thus apparent that, when the appellant made the two Tuesday morning statements, he not only was not being illegally detained but was not being detained at all. As far as we can ascertain from the record, Green was not under police restraint until shortly before 2:00 o'clock Tuesday afternoon when he started the ambulance journey from Emergency to General, on which he was accompanied by a police officer and after which he was in the locked ward at General under police guard. In view of these facts, testimony concerning what Green said in the two Tuesday morning interviews, is not subject to attack under the McNabb rule.

■ The remaining statement, made to the fire inspector at 3:00 o'clock Tuesday afternoon, was made while Green was in custody. But, even if that custody were thought to be unlawful detention, evidence of his statement then made can scarcely be said to have prejudiced him; for the Tuesday afternoon statement was identical in all material respects with that appellant made that morning at 10:00 o'clock when he was not being detained, which was therefore unquestionably admissible.

■ Green testified he was not threatened or mistreated at any time by anybody, and made no claim that the statements he made in the four pre-arraignment interviews were induced by any form of coercion. His statements were not confessions. Evidence concerning them merely went to Green's credibility as a witness. There was no unlawful detention due to failure promptly to carry him before a committing magistrate. He was arraigned just as soon as the hospital authorities released him.

Delay in arraigning a suspect caused by his necessary hospitalization can hardly be called illegal detention.

Strong suspicion that Green had set the fires, and that his wounds were self-inflicted with an ice pick to give credence to his story about a colored man attacking him with a "long dagger," arose from the fact that he was the only living person in the tightly closed house when the firemen arrived. But the police could hardly be expected to make a murder charge on that suspicion alone. It was not until Wednesday evening when they obtained the letter, written some hours before the death of Miss Brown,[7] that a murder charge was justified. As the Supreme Court said in United States v. Carignan, 1951, 342 U.S. 36, 44–45, 72 S.Ct. 97, 101, 96 L.Ed. 48, "This case falls outside the reason for the [McNabb] rule, i. e., to abolish unlawful detention." We note also that the trial judge carefully charged the jury to disregard Green's pre-arraignment statements unless it believed to the exclusion of a reasonable doubt that they were voluntarily made.

■ Since there was neither coercion nor illegal detention, and no suggestion of inducement through promises, we hold that evidence of Green's pre-arraignment statements was properly received and that the McNabb rule does not apply.[8]

We have given careful consideration to the other reasons for reversal advanced by counsel but must reject them as insufficient. None appears to require discussion.

Affirmed.

PRETTYMAN, Circuit Judge.

I concur in the opinion and judgment of the court but solely because of the opinion of the Supreme Court in the Trono case. I see no escape in this case from the law there laid down.

BAZELON, Circuit Judge (dissenting).

Upon the ground stated in the opinion of Judge FAHY and upon the further ground stated below, I dissent from the judgment of the court.

Statements the police obtained by questioning appellant during the two days intervening between his arrest and his arraignment were admitted in evidence against him.[1] Because appellant's injuries required his confinement in a hospital during this period, the majority holds there was no "illegal detention" within the meaning of Rule 5(a), F.R. Crim.P., and hence the McNabb rule does not bar the statements. I cannot agree. I would hold the admission of the statements to be error warranting a new trial.[2]

---

7. Uncontradicted medical testimony concerning the autopsy showed she died from inhaling hot irritating gases caused by the fire, which started about 7:00 a. m. Green claimed she was dead at 12:30 a. m. See Green v. United States, 1955, 95 U.S. App.D.C. 45, 218 F.2d 856, for a full statement of this testimony on this subject which was given at the first trial, and which was also given in practically the same form at the second trial with which we are now concerned.

8. Cf. Judge Washington's concurring opinion in Tillotson v. United States, 1956, 97 U.S.App.D.C. 402, 231 F.2d 736, 740, in the course of which he said:
   "* * * Clearly, lack of coercion alone—or lack of illegal detention alone—does not render a confession admissible. But where there is neither coercion nor

illegal detention, and no suggestion of inducement through promises, the confession should be admitted. * * *"

1. Whether, prior to his transfer to the locked ward of the District of Columbia General Hospital, appellant had been placed under arrest or just happened to be fairly constantly attended by policemen and fire inspectors is not clear from the record. But from Tuesday afternoon to Thursday, he was under arrest and the statements here in question are those obtained from him during that period in interrogations by two policemen and two fire inspectors.

2. That the appellant, in making the admissions in question neither intended nor purported to confess, does not prevent the application of the McNabb rule. The majority, indeed, although it notes that

Rule 5, F.R.Crim.P., requires arraignment "without unnecessary delay." " * * * What constitutes 'unnecessary delay,' i. e., reasonable time within which the prisoner should be brought before a committing magistrate, must be determined in the light of all the facts and circumstances of the case." [3] Reasonableness of a delay of arraignment is, therefore, a functional consideration which embraces not only the circumstances occasioning the delay but also the events transpiring in the course of it.

The most obvious of the "evil implications of secret interrogation" [4] is that the accused may be unaware of such matters as his right to have counsel and to refuse to answer questions, and the risk that any statement he makes may be used against him. Hence Rule 5(a) directs that an arrested person be taken "without unecessary delay before the nearest available" committing officer, who "shall inform" the accused, as required by Rule 5(b), of the aforementioned matters *inter alia*.

The rule was promulgated because failure to arraign promptly "was thought to give opportunity for improper pressure by police before the accused had the benefit of the statement by the commissioner." [5] Opportunity for such presure is present whenever the arrested person "is under the exclusive control

---

"there was no confession," finds McNabb inapplicable not on that account, but only because there was no "illegal detention." To the extent that Ercoli v. United States, 1942, 76 U.S.App.D.C. 360, 131 F.2d 354, dealing with the requirement of corroboration of extrajudicial admissions, is here relevant, it must be held to have been overruled in Opper v. United States, 1954, 348 U.S. 84, 75 S.Ct. 158, 99 L.Ed. 101. The Supreme Court pointed out that it is inconsequential whether the statements were made as a confession or for the purpose of exculpation, so long as they are "statements of the accused out of court that show essential elements of the crime * * *." Id., 348 U.S. at page 91, 75 S.Ct. at page 163. Regarding the contention of the Government (and our view in Ercoli) that admissions intended as exculpation should be excepted from the requirement of corroboration, the Court said: "This accords with Professor Wigmore's view [citing Evidence (3d ed.) § 821; relied on by us in Ercoli, 76 U.S.App.D.C. at page 362, 131 F.2d at page 356, notes 6, 7 and 8]. The statements here are exculpatory. * * * There is no opinion of this Court declaring or declining such an exception. We conclude that exculpatory statements, however, may not differ from other admissions of incriminating facts. Given when the accused is under suspicion, they become questionable just as testimony by witnesses to other extrajudicial statements of the accused." Id., 348 U.S. at pages 91–92, 75 S.Ct. at page 164.

3. Notes of Advisory Committee, Rule 5(a). The Supreme Court, speaking of the statutory predecessors of Rule 5, said in McNabb v. United States, 1943, 318 U.S. 332, 343–344, 63 S.Ct. 608, 614, 87 L.Ed. 819:

"The purpose of this impressively pervasive requirement of criminal procedure is plain. A democratic society, in which respect for the dignity of all men is central, naturally guards against the misuse of the law enforcement process. Zeal in tracking down crime is not in itself an assurance of soberness of judgment. Disinterestedness in law enforcement does not alone prevent disregard of cherished liberties. Experience has therefore counseled that safeguards must be provided against the dangers of the overzealous as well as the despotic. The awful instruments of the criminal law cannot be entrusted to a single functionary. The complicated process of criminal justice is therefore divided into different parts, responsibility for which is separately vested in the various participants upon whom the criminal law relies for its vindication. Legislation such as this, requiring that the police must with reasonable promptness show legal cause for detaining arrested persons, constitutes an important safeguard—not only in assuring protection for the innocent but also in securing conviction of the guilty by methods that commend themselves to a progressive and self-confident society. For this procedural requirement checks resort to those reprehensible practices known as the 'third degree' which, though universally rejected as indefensible, still find their way into use. *It aims to avoid all the evil implications of secret interrogation of persons accused of crime.*" (Emphasis supplied.)

4. Supra note 2.

5. United States v. Carignan, 1951, 342 U.S. 36, 45, 72 S.Ct. 97, 102, 96 L.Ed. 48.

of the police, subject to their mercy, and beyond the reach of counsel or of friends." [6]

That the delay in arraigning appellant was unavoidable did not diminish the opportunity for pressure. The secrecy of appellant's interrogation—and hence its evil implications—could have been no greater if the delay had been deliberately planned by the police. Hence, if the evil implications of secret interrogation are to be avoided, in a case where delay of arraignment cannot be avoided, it is at least indispensable that the police give the accused substantially that advisory information which the committing officer would give him at the arraignment.[7] The practice of thus advising arrested persons has been prescribed by rule of court in England at least since 1912 [8] and was used by "the respectable officer" in this country as long as half a century ago.[9] That this is consistent with proper and efficient police work is clear from the statement of J. Edgar Hoover, Director of the Federal Bureau of Investigation, that:

> " * * * Special Agents are taught that any suspect or arrested person, at the outset of an interview, must be advised that he is not required to make a statement and that any statement given can be used against him in court. Moreover, the individual must be informed that, if he desires, he may obtain the services of an attorney of his own choice." [10]

Since there is no showing here of any circumstances to mitigate the evils of appellant's secret interrogation, I would apply the salutary requirements of Rule 5 and hold that McNabb bars the statements made pursuant to police interrogations during the period of delay. "A statute [or a rule] carrying such purposes is expressive of a general legislative policy to which courts should not be heedless when appropriate situations call for its application." [11]

It is said that the admission in evidence of the statements obtained through secret interrogation of the appellant resulted in no prejudice to him. Such a conclusion can be reached only when "the conviction is sure that the error did not influence the jury, or had but very slight effect * * *." Kotteakos v. United States, 1946, 328 U.S. 750, 764, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557. Having no such sure conviction,[12] especially in the light of the fact that this

6. Mr. Justice Douglas, concurring in United States v. Carignan, 342 U.S. at page 46, 72 S.Ct. at page 102. In Watson v. United States, 98 U.S.App.D.C. 221, 234 F.2d 42, the court had occasion to comment on the police practice of keeping a prisoner secreted from lawyers. See note 11 of my dissenting opinion in Mallory v. United States, 98 U.S.App.D.C. 406, 236 F.2d 701.

7. Cf. Pixley v. United States, 10 Cir., 220 F.2d 912, 913, holding a two-day delay of arraignment not improper where the accused was immediately warned that "he did not have to make a statement; that any statement he might make could be used against him; and that he was entitled to an attorney * * *"; also, Haines v. United States, 9 Cir., 1951, 188 F.2d 546, certiorari denied 1951, 342 U.S. 888, 72 S.Ct. 172, 96 L.Ed. 666, approving the admission in evidence of statements obtained through two interrogations, each of which was preceded by the equivalent of a Rule 5 advisory statement.

8. McNabb v. United States, 318 U.S. at page 345, note 9, 63 S.Ct. 608, 87 L.Ed. 819, and authorities there cited; see also 3 Wigmore, Evidence (3d ed.) 294–298.

9. Major Sylvester, Washington Chief of Police, President of International Association of Chiefs of Police, Proceedings of 17th Annual Meeting (1910) 54, quoted in 3 Wigmore, Evidence (3d ed.) 316, 317.

10. Hoover, Civil Liberties and Law Enforcement, 37 Iowa L.R. 175, 182 (1952).

11. McNabb v. United States, 318 U.S. at page 344, 63 S.Ct. at page 615, 87 L.Ed. 819.

12. Sergeant Couture testified that appellant told him on Thursday that he had written and mailed the letter to Mrs. Anthony "just prior to his detecting the odor of smoke." That time was fixed by all the evidence, including appellant's own testimony, at about 7:00 a.m. That statement vitally contradicts the story

is a capital case, I am unable to agree that the error was not prejudicial. Cf. Anderson v. United States, 1943, 318 U.S. 350, 356–357, 63 S.Ct. 599, 87 L.Ed. 829.

I am authorized to say that EDGERTON, Chief Judge, joins in this dissent.

FAHY, Circuit Judge (dissenting).

Green was first tried for arson and for murder in the first degree while committing arson. He was convicted of arson and of second degree murder. This result constituted an acquittal of first degree murder. Trono v. United States, 199 U.S. 521, 529–530, 26 S.Ct. 121, 50 L.Ed. 292, and see, dissenting opinion of Mr. Justice McKenna, 199 U.S. 538, 26 S.Ct. 121. He appealed only from the judgment of conviction of second degree murder.[1] Green v. United States, 95 U.S.App.D.C. 45, 46, 218 F. 2d 856, 857. We there reversed that conviction. That appeal did not bring to this court his acquittal of first degree murder.[2] Accordingly his appeal did not waive his constitutional right not to be placed in jeopardy a second time for first degree murder. U.S.Const. Amend. VI. Therefore I think he could not be tried again for first degree murder. I do not think Trono v. United States, 199 U.S. 521, 26 S.Ct. 121, 50 L.Ed. 292, requires us to hold otherwise. For the Trono case arose in the Philippine Islands where Trono's conviction of a lesser offense than that for which he was indicted and first tried

was appealed to the Supreme Court of the Philippines under procedures which permitted the whole case to be reviewed and tried *de novo* in the appellate court. Trono v. United States, supra, 199 U.S. at page 534, 26 S.Ct. at page 124; United States v. Berry, 5 Phil.Rep. 409; United States v. Clemente, 24 Phil.Rep. 178; cf. Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114; United States v. Atienza, 1 Phil.Rep. 736; United States v. Abijan, 1 Phil.Rep. 83; United States v. Padilla, 4 Phil.Rep. 511; United States v. Flemister, 4 Phil.Rep. 300, 5 Phil.Rep. 650; United States v. Noriega, 31 Phil.Rep. 310, 314; United States v. Tamparong, 31 Phil.Rep. 321, 328; United States v. Gimenez, 34 Phil. Rep. 74, 77. So that when Trono took his appeal, in his effort to obtain acquittal entirely, he waived his acquittal of the more serious offense. Therefore he could be again put in jeopardy with respect to it. No comparable situation governed Green's previous appeal, and I think we should apply the prevailing rule at common law which would have precluded his second trial for the greater offense of which he had been acquitted. See cases cited in Trono by Mr. Justice McKenna, 199 U.S. at page 540, note 1, 26 S.Ct. 121, 50 L.Ed. 292. It is true that in Trono the opinion of Mr. Justice Peckham, for himself and for Mr. Justice Brewer, Mr. Justice Brown and Mr. Justice Day went further, and its language if applied to Green's case would require a conclusion contrary to that I state; but since that opinion did

---

appellant told at the trial: that he had found Miss Brown dead at about 12:30 a. m.; that, in a fit of despondency he had immediately written the letter and mailed it before 1:00 a. m.; that then, deciding to wait until morning before calling anyone to take care of the body, he went back to bed; that when he arose at about 7:00 a. m., even before he was fully dressed, he detected smoke and going to investigate, was attacked and knocked senseless. If the jury believed that appellant had gone out to mail a letter at 7:00 a. m., as Sergeant Couture said appellant had admitted, then appellant's whole story must, or could, have become incredible.

1. His notice of appeal, apparently in his own handwriting, in terms applied to arson as well as second degree murder. But in presenting the case in this court both the United States and appellant represent that the appeal was only from that part of the judgment which covered the conviction of second degree murder.

2. Nor, apparently, did it bring to this court his conviction of arson. See note 1 supra. Our prior decision, Green v. United States, supra, did not consider the arson conviction.

not have the adherence of a majority of the Court, and since also the situation in the Philippines differed materially from that here, I believe with all deference that we are free to apply to Green's case principles which do not accord with all that is said in Mr. Justice Peckham's opinion in Trono.

I am authorized to say that Chief Judge EDGERTON and Circuit Judge BAZELON join in this dissent.